**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

**Filed 1/22/97**

FOR THE TENTH CIRCUIT

---

DARIN DUANE GAYLOR,                     )
                                        )
            Plaintiff-Appellant,        )
                                        )
v.                                      )     No. 95-1172
                                        )
JOHN DOES;  DENVER COUNTY SHERIFF'S     )
DEPARTMENT, named:  John and Jane Does 1 )
through 50, Denver City and County Sheriff's )
Deputies in their official and individual capacity; )
DENVER, CITY AND COUNTY OF,             )
                                        )
            Defendants-Appellees.       )

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-S-2031)**

---

Darin Duane Gaylor, Plaintiff-Appellant, pro se, and Mark W. Williams of Berryhill, Cage & North, Denver, Colorado, for Plaintiff-Appellant.

Theodore S. Halaby (Robert M. Liechty with him on the brief), of Halaby, Cross, Liechty, Schluter & Buck, Denver, Colorado, for Defendants-Appellees.

---

Before **PORFILIO, HOLLOWAY,** and **LUCERO,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

---

Plaintiff-appellant Gaylor appeals from the district court's entry of summary judgment against him on his claim under 42 U.S.C. § 1983 of deprivation by the City and County of Denver, Colorado, of his rights under the Due Process Clause of the Fourteenth Amendment and the Fifth and Sixth Amendments also to the United States Constitution. His claims arise from his five-day incarceration in the Denver City and County jails following a misdemeanor arrest on September 4, 1992, and before being taken to a magistrate and being released on bond on September 9. He claims, inter alia, that defendant Denver has a policy or custom of neglecting to train, supervise and control the deputies working at the jail, named as John and Jane Does 1 through 50, and other deputies. Complaint ¶ 9; I R., Item 1 at 2. Plaintiff Gaylor also complains of defendant Does' actions of not informing him about his bail status and "of holding Plaintiff incommunicado for five days [as] unreasonable and a violation of due process." Id., ¶ 15 at 3. We reverse the summary judgment and remand for further proceedings.

## I

On September 4, 1992 (a Friday), Gaylor was arrested on a misdemeanor charge pursuant to a probable cause arrest warrant that had been issued by a judge on August 24, 1992.[1] The magistrate assigned to review bail set bail at $1,000 on Saturday, September 5,

---

[1] There is no material dispute on the fact of the arrest having been on a probable cause warrant. Appellant's Opening Brief, page 2, states that Gaylor was arrested on September 4, 1992, on a probable cause warrant. The warrant appears in our record. I R., Item 15, Ex. B. The briefs disagree as to the name of the issuing judge, whose signature is difficult to decipher, the Appellant's Brief stating it was signed by Judge Robert B. Crew, while

2

after he reviewed the criminal summons and complaint, the affidavit and application for arrest warrant. Based on the documentation, Magistrate Garcia determined that Judge Breese, who issued the warrant, had found probable cause to hold Gaylor. Magistrate Garcia then, on September 5 (Saturday), set Gaylor's bond at $1,000. Affidavit of former Magistrate Garcia, I R., Item 15, Defendant's Brief in Support of Motion for Summary Judgment, Ex. C at 1-2. An affidavit of Officer Comito, Division Chief of Operations for the Denver Sheriff's Downtown Jail, states that through review of the jail's records, he knew that entry of Gaylor's $1,000 bond was put on the jail's computer the day after Gaylor's entry into the jail (thus on Saturday, September 5) at approximately 12:00 noon. See note 2, infra, ¶ 2. However, Gaylor states by deposition that he was told he must see a judge to get bond set to get out; that when questioned whether he asked deputy sheriffs Saturday how he would get out, he said he got the same reply "everyday, morning and afternoon, all the way through" that he would be on the next bus. I R., Item 15, Denver's Brief in Support of Motion for Summary Judgment, Ex. A at 25, 27-28.

Gaylor's roommates, Kenneth Wallendorf and Melody Blankenship, state in their affidavits that they repeatedly called the jail from September 4 to September 8, 1992, and

---

Appellee's Corrected Brief before us states that Gaylor was arrested on a warrant issued by County Court Judge James Breese. An affidavit in our record from a former magistrate of the City and County of Denver states that he reviewed the documentation on September 5, 1992, including the criminal summons and complaint, determining that Judge Breese had found probable cause to hold Mr. Gaylor, and therefore Magistrate Garcia then, on September 5, 1992, set Gaylor's bond at $1,000. Id., Ex. C at 2. Thus, the material fact that Gaylor was arrested on a probable cause warrant is undisputed.

inquired about bail for Gaylor and were told that a bail amount had not been set. I R., Item 19, Affidavit of Kenneth Wallendorf; I R., Item 19, Affidavit of Melody Blankenship. The following Wednesday, September 9, 1992, Gaylor was taken before Magistrate Mootz, who reduced his bail to $700. I R., Item 15, Ex. E. This bail was posted and Gaylor was released that day.

This civil rights action was filed under 42 U.S.C. § 1983 against the City and County of Denver and its deputies who worked at the jail. They were named as John and Jane Does, whose names were unknown. Gaylor claimed, inter alia, that his constitutional rights under the Due Process Clause had been violated by keeping him in jail for the five-day period without a hearing before a magistrate and by not informing him about his bail status. The district judge denied leave to amend the complaint to name the deputies who were the Doe defendants since by the time Gaylor moved to amend the complaint the statute of limitations had run as to claims against the deputies. I R., Ex. 23.

On January 25, 1995, defendant City and County of Denver had filed a motion for summary judgment. That motion asserted that holding a person in jail for five days upon a probable cause warrant was not a constitutional violation and that, even assuming there was such a violation, it was not caused by any policy of the City. I R, Item 14. After consideration of the City's brief, Gaylor's deposition and several affidavits, and plaintiff Gaylor's response and his opposing affidavits and exhibits, the magistrate judge to whom the matter had been referred submitted a report and recommendation for dismissal of the action.

4

Plaintiff Gaylor objected to that report. The district judge approved the report and recommendation and granted summary judgment for the City. For reasons we explain below, on this record we cannot agree that the summary judgment rejecting Gaylor's due process claim was proper.

## II

Gaylor's complaint states, <u>inter alia</u>, that the suit was commenced under the Fourteenth Amendment to the United States Constitution; that he was held incommunicado for five days in Denver's jail by its deputies, which was unreasonable and a violation of due process; he was denied the ability to contact a bail bondsman; and that the City has a policy or custom of neglecting to train, supervise and control the Doe defendants and other deputies. Complaint, I R., Item 1 at 1-3.

We set out the allegations underlying plaintiff Gaylor's claim in order to assess its viability as a constitutional claim. Insofar as the sufficiency of the averments is considered, since Gaylor is proceeding <u>pro se</u>, "the court should construe his pleadings liberally and hold the pleadings to a less stringent standard than formal pleadings drafted by lawyers." <u>Riddle v. Mondragon</u>, 83 F.3d 1197, 1202 (10th Cir. 1996). Of course, we are actually reviewing a summary judgment against Gaylor. We review a grant or denial of summary judgment <u>de novo</u>, applying the same legal standard as the district court pursuant to Fed. R. Civ. P. 56. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

5

issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. If there is no genuine issue of material fact in dispute, we then determine if the substantive law was correctly applied by the district court. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Under these standards governing our review, we turn to the record and controlling constitutional precedents.

### III

As noted earlier, see note 1, supra, here the arrest of Gaylor was made on a probable cause warrant and after a judicial determination of probable cause. Thus due process constraints apply: "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause. Villanova v. Abrams, 972 F.2d 792, 797 (7th Cir. 1992) (emphasis added); cf. Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990) (noting that a convicted inmate awaiting sentencing is protected primarily by Eighth Amendment). The Seventh Circuit also observed in Villanova that "[t]he deprivation of liberty brought about by confining the arrestee, or a person civilly committed, is tested under the due process clause." Id. at 797 (citing United States v. Salerno, 481 U.S. 739, 746 (1987)).

Gaylor's submissions make a showing that between September 4 and September 8, 1992, Gaylor's roommates repeatedly called the Sheriff's Deputies to ascertain whether

6

Gaylor's bail had been set, and that each time these roommates were told that it had not been set. I R., Item 19, Plaintiff's Response to Defendant's Motion for Summary Judgment, Affidavit of Wallendorf at 1-2 ("After repeated telephone calls to the Denver City Jail from September 4th, 1992 to September 8th, 1992, your affiant was told that a bail amount had not been set."); id., Affidavit of Blankenship (same). In addition, Gaylor states that he asked a number of times whether his bail had been set:

> Every time a deputy came by my cell, I would ask them . . . when I was going to see a judge so I could get a bond set and bond out. Every time the reply was the same from every individual, that I would be on the next bus. <u>That was the same reply from every one of them every day, morning and afternoon, all the way through.</u>

I R., Item 15, Defendant's Brief in Support of Motion for Summary Judgment, Ex. A, Transcript of Gaylor Deposition at 27-28 (emphasis added).

Nevertheless, the record is undisputed that Gaylor's bail in fact had been set at $1,000 on Saturday, September 5, 1992, by Magistrate Garcia by approximately 12:00 noon. I R., Item 15, Defendant's Brief in Support of Motion for Summary Judgment, Ex. C, Affidavit of former Magistrate Garcia at 2. The affidavit of Magistrate Mootz, page 2, further shows that on September 9, 1992, Magistrate Mootz reduced Gaylor's bond from $1,000 to $700. I R., Item 15, Defendant's Brief in Support of Motion for Summary Judgment, Ex. C. Viewing the record in the light most favorable to Gaylor as a party against whom summary judgment was granted, Cannon v. City and County of Denver, 998 F.2d 867, 870 (10th Cir. 1993), there is evidence that the Sheriff's Deputies repeatedly misinformed Gaylor and his

roommates as to Gaylor's bail status after his arrest on September 4. Gaylor's bail was reduced to $700 on September 9, and an appearance bond in that amount was approved on September 9 for Gaylor's release. I R., Item 15, Defendant's Brief in Support of Motion for Summary Judgment, Ex. F. By thus reading the record favorably to Gaylor, we mean only that we are following the strictures of our precedents for testing a summary judgment. We in no way decide these fact issues in Gaylor's favor, and do not mean to imply any acceptance of the veracity of Gaylor or his witnesses over that of other witnesses.

Thus the evidence viewed most favorably to Gaylor may, if accepted by the trier of the facts, support conclusions that Gaylor was held from September 4 until September 9, 1992, when he made bond; that he was not informed about his bail status until he made the appearance bond on September 9; and that during this period, Denver was following a policy of advising a detainee of his bond status "if he asks for same." Division Chief Comito stated that an inmate may bond out any time he knows the bond amount.[2]

---

[2]In support of Denver's motion for summary judgment, an affidavit of Division Chief Comito, Chief of Operations for the Denver Sheriff's downtown jail, was filed on January 25, 1995. I R., Item 14, Ex. G. It states that the Division Chief is the official policy maker regarding the matters set forth in the affidavit. The affidavit states:

> 1.    I am the division chief of operations for the Denver sheriff's downtown jail, the pre-arraignment detention facility, also known as PADF. Consequently, <u>I am the official policy maker regarding the matters set forth below.</u>
> 2.    Through a review of our records, I know that the entry of Mr. Gaylor's $1,000 bond was put on the jail's computer on the day after Mr. Gaylor's entry into the jail (Saturday, September 5, 1992) at approximately 12:00 noon. There is a computer terminal on the floor where Mr. Gaylor was

These facts are the framework Gaylor relies on to sustain his claim of due process violations. We feel that the question whether Gaylor has made a sufficient case turns on due process precedents such as <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), where the Court stated:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, <u>we think that the proper inquiry is whether those conditions amount to punishment of the detainee.</u> . . .
>
> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention.
>
> . . . .
>
> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the

---

housed. <u>It is the jail's policy to inform any inmate of his bond amount if he asks for same</u> and all the deputy sheriffs are trained in using the computer for this purpose. An inmate has an opportunity to bond out of jail <u>anytime he knows his bond amount.</u>

    3.    Pursuant to our practice, Mr. Gaylor would have been told on Friday when he came in that his bond would have been set the next day.

    4.    Since approximately 1987, we have given our deputy sheriff recruits approximately 20 hours of training on the use of the computer. The deputy sheriffs are trained that they are to use the computer to answer inmate questions. The deputy sheriffs are also trained to help inmates bond out so as to alleviate overpopulation at the jail.

<u>Id.</u> at 1-2 (emphasis added).

9

governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Id. at 535, 537, 538-39 (footnotes omitted) (emphasis added).

The Court discussed the need for punitive restrictions being rationally connected to a permissible purpose in Salerno:

To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation we look first to legislative intent. Schall v. Martin, 467 U.S., at 269. Unless Congress expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

481 U.S. at 739 (emphasis added); see also Block v. Rutherford, 468 U.S. 576, 584 (1984) (observing that absent an intent to punish, the validity of conditions of pretrial detention turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether the restriction appears excessive in relation to the alternative purpose assigned to it).

In this case, Gaylor obtained a liberty interest in being freed of detention once Magistrate Garcia set his bond at $1,000 on Saturday morning, September 5, by about noon. The setting of bond in effect accepted the security of the bond for Gaylor's appearance, and hence the state's justification for detaining him faded. See Salerno, 481 U.S. at 750-51. Therefore, we consider whether the policy in question "punished" Gaylor by infringing his liberty interest unreasonably and in a way unrelated to a legitimate goal, such as insuring his appearance for trial or protecting others from him.

10

We considered the viability of claims of municipal liability under § 1983 in Hinton v. City of Elwood, Kansas, 997 F.2d 774 (10th Cir. 1993). There we held that:

> Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged. City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1202-03, 103 L.Ed.2d 412 (1989). When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of "'deliberate indifference' to the rights of its inhabitants." Id. at 389, 109 S. Ct. at 1205.

997 F.2d at 782.

Denver suggests that the intervention of the three-day Labor Day weekend is an extenuating circumstance undercutting Gaylor's claim of a due process violation. This was suggested because the five days that Gaylor was incarcerated included two weekend days and Labor Day. See Denver's Brief in Support of Motion for Summary Judgment, Ex. C at 1-2, Affidavit of former Magistrate Garcia; Defendant's Supplemental Brief at 7.

We are not persuaded by this argument of Denver. Here the intervening three-day holiday is not shown to have contributed to the delay in Gaylor's release. As Magistrate Garcia's affidavit shows, on Saturday, September 5, Garcia reviewed the documents and then set Gaylor's bond at $1,000, and at approximately noon that Saturday, this was entered in the jail's computer. Affidavit of Division Chief Comito at 1, Ex. G to Denver's Motion for Summary Judgment. And as Chief Comito states: "an inmate has an opportunity to bond out of jail any time he knows his bond amount." Id. at 2 (emphasis added). Thus it is the delay after Gaylor's bond was set (Saturday morning, September 5), until his release the following

11

Wednesday on which we must focus. In these circumstances the three-day holiday is not material. From all that the record shows, Gaylor could have made bond and been released Saturday had he learned that his bond had been set.

**IV**

In view of these principles, we have a troubling record. From the submissions of Denver and those of Gaylor it may be found that it is the official policy of the Denver jail to inform any inmate of his bond amount only "if he asks for same." (Emphasis added.) There is support for this conclusion from the affidavit of Division Chief Comito in which Chief Comito stated that he is "the official policy maker" regarding the matters discussed there on advising inmates about their bond status. I R., Item 14, Ex. G; see note 2, supra. Chief Comito's affidavit also states that an inmate has an opportunity to bond out of jail "anytime he knows his bond amount." (Emphasis added.) Thus if Gaylor had been advised with reasonable promptness after his bail amount was entered in the computer at about noon Saturday, for all that appears here he would have been able to make bail arrangements promptly and be released. He did so with no apparent difficulty four days later when his reduced bail was known by him.

We find no assertion of a "legitimate goal," Bell, 441 U.S. at 539, suggested by the City for a policy of informing a detainee of his bond status only "if he asks for same." There is no suggestion of such an objective in either the City's original brief or its brief filed after our order for supplemental briefing in which we directly requested further briefing on the

12

constitutionality of the actions by the City which the plaintiff challenges as due process violations. See Appellee's Corrected Brief at 1-7; Defendant's Supplemental Brief at 1-3. In fact, Division Chief Comito's affidavit suggests an interest by the City that is impeded by the policy of the City. His affidavit states, ¶ 4, that the deputy sheriffs are trained "to help inmates bond out so as to alleviate overpopulation at the jail." See note 2, supra, ¶ 4 of Affidavit (emphasis added). Failing to notify inmates that their bonds were set would instead tend to cause overpopulation at the jail to worsen.

Thus no legitimate goal is suggested in defense of the deputies' actions and omissions which allegedly caused four days of unnecessary detention of Gaylor. The restriction or condition was not "reasonably related to a legitimate goal" suggested by the City and it appears "arbitrary or purposeless" under the Bell v. Wolfish analysis, 441 U.S. at 539, and may be found to be "punishment," not mere regulatory policy. That being the case, we cannot uphold the summary judgment adverse to Gaylor. The Magistrate Judge held that "[even if the Plaintiff was not given an opportunity to post his bond until five days after his arrest, this does not violate principles of due process." Recommendation of United States Magistrate Judge, I R., Item 25 at 2. He found that "[nothing about the length of Plaintiff's five-day stay evidences such an abuse of power as to shock the conscience." Id. Without further elaboration, the District Judge also concluded "[the plaintiff can show neither a constitutional violation nor municipal liability," and granted summary judgment for the defendant City. Order, I R., Item 28.

We cannot agree to such a summary disposition on this record. Under the precedents binding on us, we cannot uphold the summary judgment rejecting plaintiff's due process claim summarily in light of the evidence from which the trier of fact may find it was the policy of the Denver jail not to inform detainees of their bail status until they asked, and that Denver's policy was not "reasonably related to a legitimate goal" by the City. We hold that such a policy not to inform detainees of their bail status until they asked, if found to have been followed by Denver, would satisfy the first element for municipal liability -- "the existence of [the alleged punitive] municipal policy or custom." Hinton v. City of Elwood, Kansas, supra, 997 F.2d at 782.

There remains the further element noted in Hinton for municipal liability, "a direct causal link between the policy or custom and the injury alleged," id. at 782, and since Gaylor's claim asserts a failure to inform him about his bail status, Hinton also notes the requirement of "deliberate indifference" in the alleged inaction of the City's deputies. On remand, the parties may develop their positions on these factual issues for the trier of fact,[3] and if the required causal link between the City's policy or custom and the injury alleged is

_____

[3]We note the assertion in Gaylor's deposition that on the occasion of one of his inquiries about his bond, one deputy said to let him check this out and the other one said: "Let me check the computer." Then Gaylor got "the standard reply." Gaylor's Deposition, I R., Item 15, Ex. A at 45. As noted earlier, Gaylor said he was always told he would be "on the next bus" to court. Id. at 28. On the other hand, Division Chief Comito stated that the deputies were trained to use the computers to answer bail status inquiries and to help inmates bond out. See note 2, ¶ 4. Whether it should be found that Denver had a municipal policy to inform detainees of their bail status only if they asked, and whether, if so, any damages to Gaylor were caused by such policy, are questions for the trier of fact.

14

found, and the requisite deliberate indifference in the alleged failure to act is also found, such as by Gaylor's establishing failure by Denver to train its employees, id. at 782, Canton v. Harris, supra, 489 U.S. at 389, then findings as to any damages may be made by the trier of fact. If such findings are made in favor of Gaylor and against the City and County of Denver, recovery on Gaylor's due process claim should be granted; otherwise judgment in favor of Denver should be entered.

Accordingly, we **REVERSE** the summary judgment and **REMAND** the cause for further proceedings in accord with this opinion.