**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KENNETH JEROME DAWSON,

    Plaintiff - Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS OF JEFFERSON
COUNTY, COLORADO; JEFFERSON
COUNTY, COLORADO, DEPARTMENT
OF HUMAN SERVICES; JEFFERSON
COUNTY, COLORADO, DIVISION OF
JUSTICE SERVICES; JEFFERSON
COUNTY, COLORADO, SHERIFF'S
OFFICE; JEFF SHRADER,

    Defendants - Appellees,

and

HEATHER BECKER; KURT
PIERPOINT; LESLIE HOLMES;
MATTHEW WRIGHT; RYAN
KINSELLA; RYAN L. ROPERS; SARAH
MCHUGH; STEPHANIE LAHUE,

    Defendants.

No. 17-1118
(D.C. No. 1:16-CV-01281-MEH)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.
_____

    [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Kenneth Jerome Dawson appeals the dismissal of his action brought pursuant to 42 U.S.C. § 1983 in which he asserts a violation of his Fourteenth Amendment substantive due process rights. Dawson challenges the official policies of the Jefferson County Jail. Due to the timing of Dawson's detention, the timing of his posting of bond, and the court-ordered release condition that Dawson be fitted with a GPS monitor, the policies Dawson challenges resulted in a three-night and a three-day delay in his pretrial release after he posted bond. Dawson sued the Board of County Commissioners of Jefferson County; Jefferson County Department of Human Services; Jefferson County Division of Justice Services; the individual employees of the County, Department, Division, and/or the Pretrial Services Program in their individual and official capacities; Jeff Shrader in his official capacity as Sheriff of Jefferson County; and the Jefferson County Sheriff's Office.

Dawson's appeal concerns only the dismissal of his § 1983 claims asserted against defendants-appellees[1] for their policies which delayed his release from custody. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

**I**

*A. Facts*

The following undisputed facts are taken from Dawson's amended complaint and the exhibits attached thereto. On Thursday, May 29, 2014, around 5:30 p.m.,

---

[1] Defendants-appellees are: (i) the Board of County Commissioners of Jefferson County, (ii) Jefferson County Department of Human Services, (iii) Jefferson County Division of Justice Services, (iv) the Jefferson County Sheriff's Office, and (v) Jeff Shrader in his official capacity as Sheriff of Jefferson County (hereinafter, "defendants-appellees").

police officers in Lakewood, Colorado, arrested Dawson at his home for allegedly violating a state court restraining order that prohibited him from contacting his wife. App., at 13–14, ¶¶ 10–11. The Lakewood Police brought Dawson to the Jefferson County Jail where he was placed in the custody of the Sheriff's Office. Id. at 14, ¶ 12.

The next morning, on Friday, May 30, 2014, the Jefferson County District Court set Dawson's bond at $1,500. Id. ¶ 13. As another condition of Dawson's release, the court also ordered GPS monitoring. Id. On Friday, at 10:33 a.m., the Jefferson County Pretrial Services Department transmitted to the Sheriff's Office a "hold" of Dawson regarding electronic monitoring. Id. ¶ 14. The "hold" stated, "[t]his defendant is to remain in custody until such time that a Pretrial Services Representative has forwarded written notice to release this hold." Id. (quoting Ex. A).

Two written policies of the Jefferson County Division of Justice Services authorized the "hold" of Dawson: (i) Policy No. 3.1.43, "Pretrial Holds & Releases" (the "Holding Policy"); and (ii) Policy No. 3.1.68, "Electronic Monitoring" (the "Monitoring Policy"). Id. ¶ 15 (citing Exs. B, C). Dawson alleges the Holding and Monitoring Policies "authorize and require Pretrial Services staff to: (a) place a hold on a defendant to prevent the Sheriff's Office from releasing the defendant pending the fitment of [a] court-ordered GPS monitoring device; (b) arrange for the fitment of the GPS device upon the defendant; and (c) then release the hold upon the defendant,

3

thereby enabling the Sheriff's Office to release the defendant, subject to any other holds or court-ordered conditions of release." Id. ¶ 16.

On Friday evening, Dawson posted a cash bond of $1,500. Id. at 15, ¶ 17. At 7:40 p.m., the Sheriff's Office sent an email to Pretrial Services stating, Dawson "has bonded and is being held on your hold." Id. ¶ 18 (quoting Ex. D). Dawson claims the email from the Sheriff's Office "informed the Pretrial Services staff that the only unsatisfied condition remaining for [Dawson's] release was to fit him with the GPS monitor." Id.

The Monitoring Policy contains a "Release Schedule," which states as follows:

a)   Defendants [who] post bond before 1 PM Monday-Friday[ ] will be outfitted with the monitoring equipment by our vendor at 4 PM that same day[;]
b)   Defendants [who] post bond after 1 PM Monday-Thursday[ ] will be outfitted the following day at 4 PM[;]
c)   Defendants who post bond after 1 PM on Friday and before 1 PM on Monday will be outfitted on Monday at 4 PM[.]

Id. at 25–26, ¶ 3. The Monitoring Policy also states:

All referral paperwork must be provided to the vendor no later than **2 PM** in order to have the defendant outfitted with the equipment by 4 PM that same day. The vendor will arrive at the jail at 4 PM to place the electronic monitoring unit on the defendant and provide them with a charger and instructions upon their release from custody.

Id. at 26, ¶ 5 (emphasis in original). Based on the Monitoring Policy, because Dawson posted bond after 1:00 p.m. on Friday, he had to remain in jail until Monday at 4:00 p.m. before he could be "outfitted." Id. at 15, ¶ 19. Thus, from Friday evening, on May 30, 2014, until Monday afternoon, on June 2, 2014, Dawson was not

4

fitted with a GPS device which would have satisfied all court-ordered conditions for his release from custody.[2]  Id.

*B. Case History*

On May 27, 2016, Dawson filed this complaint in the United States District Court for the District of Colorado against multiple Jefferson County entities and several individual defendants in their individual and official capacities.  Id. at 4. After Dawson amended his complaint, id. at 21, all defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), id. at 37–56.  As regards Dawson's policy-based claims, the district court dismissed with prejudice Dawson's amended complaint against all defendants-appellees who are free-standing entities or individuals sued in their official capacities.  The district court did not dismiss Dawson's negligence claims filed against individual defendants in their individual capacities only.[3]  Dawson voluntarily dismissed those claims without prejudice and then filed this appeal.  Following our issuance of a show cause order questioning the finality of the district court's order, Dawson filed a motion with the district court

---

[2] Dawson was not fitted with a GPS monitor or released until Wednesday, June 4, 2014—five days and five nights after he posted bond.  Dawson does not challenge in this appeal the two-day delay in his release from Monday to Wednesday, which was allegedly due to jail employees' negligence.  Dawson only challenges the constitutionality of his three-day delay in release over the weekend, which was due to the Holding and Monitoring policies.

[3] The individual defendants are not parties to this appeal.

seeking a Federal Rule of Civil Procedure 54(b) certification of finality. The district court granted Dawson's motion[4] and entered its judgment on May 10, 2017. Id. at 9.

## II

We are tasked with determining whether Dawson's claims against defendants-appellees—challenging the policies resulting in a three-day delay in his pretrial release from custody after he posted bond—were properly dismissed under Rule 12(b)(6). We conclude the district court did not err in dismissing those claims.

*A. Standard of Review*

"We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo." Mocek v. City of Albuquerque, 813 F.3d 912, 921 (10th Cir. 2015). "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[A] plaintiff cannot rely on 'labels and conclusions, and a formulaic recitation of the elements of a cause of action.'" Id. (quoting Twombly, 550 U.S. at 555). "We

---

[4] The district court's Rule 54(b) certification satisfies the requirements of Stockman's Water Co. v. Vaca Partners, L.P., 425 F.3d 1263 (10th Cir. 2005). "First, the district court . . . determine[d] that its judgment is final." Id. at 1265; see App., at 185 ("[B]ecause the Court's January 3, 2017 order dismissed [Dawson's] entity liability claims with prejudice, the order is final as to those claims."). "Second, the district court . . . determine[d] that no just reason for delay of entry of its judgment exists." Stockman's, 425 F.3d at 1265; see App., at 185–86 ("[T]he remaining claims involve distinct parties and a separate period of detention, and thus, likely involve different state interests.") (allowing Dawson to immediately appeal the court's dismissal of his entity claims "may be the most efficient manner to resolve this litigation," as "denying a Rule 54(b) certification might preclude [Dawson] from appealing the entity liability claims[ ] because 'the Individual Claims arguably do not justify the cost and effort of this litigation'" (quoting Dawson's motion for Rule 54(b) certification)).

6

accordingly 'disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable.'" Id. (quoting Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012)).

*B. Section 1983 Liability*

The Supreme Court in Monell v. Department of Social Services of New York concluded that a plaintiff may sue "municipalities and other local government units" under § 1983. 436 U.S. 658, 690 (1978). Thus, as we have in similar cases, we analyze Dawson's claims, which challenge policies enacted by Jefferson County and enforced by its employees, under the same rubric applied in policy-based § 1983 actions brought against municipalities. See Dodds v. Richardson, 614 F.3d 1185, 1201–02 (10th Cir. 2010). The "Court has described the correct standard for subjecting a municipality to liability under § 1983: 'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.'" Darr v. Town of Telluride, Colo., 495 F.3d 1243, 1256 (10th Cir. 2007) (quoting Monell, 436 U.S. at 694).

There are three requirements for municipal liability under 42 U.S.C. § 1983: (1) the existence of an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury; and (3) that the defendant established the policy with deliberate indifference to an almost inevitable constitutional injury.[5]

---

[5] Without citing case law, Dawson contends that he need not allege deliberate indifference because deliberate indifference "applies to a specific subset of cases

7

Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767–69 (10th Cir. 2013).

*1. Official Policy*

Dawson alleges the first requirement for municipal liability—the existence of official policies. According to Dawson's amended complaint, "[t]he Hold was authorized by two written Policies adopted by the County and the Division: Policy No. 3.1.43, titled 'Pretrial Holds & Releases' . . . and Policy No. 3.1.68, titled 'Electronic Monitoring.'" See App., at 14, ¶ 15.

*2. Causal Link between Official Policy and Alleged Constitutional Injury*

Dawson also pleads the second requirement for municipal liability—a direct causal link between the policies and his alleged unconstitutional over detention. Dawson's amended complaint states, "[i]n accordance with this official Policy, none of the Defendants made any effort to fit Plaintiff with a GPS device or otherwise to facilitate his release from Friday evening, May 30, 2014, until Monday afternoon, June 2, 2014." Id. at 15, ¶ 20.

*3. Deliberate Indifference to an Almost Inevitable Constitutional Injury*

However, we agree with the district court that Dawson fails to satisfy the third prong, and therefore cannot state a claim against defendants-appellees. To allege the

wherein the plaintiff alleges a policy of inaction," such as "when a plaintiff seeks to hold a municipal defendant liable for failure to train." See Aplt. Reply, at 23–24. But the Supreme Court has noted that deliberate indifference is the proper standard "when actual deliberation is practical," such as "in the custodial situation of a prison," which fits squarely to the facts before us. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 851 (1998). We, therefore, apply the deliberate indifference standard in this case.

8

third requirement for municipal liability—deliberate indifference—Dawson must plead facts that plausibly suggest "the municipality ha[d] actual or constructive notice that its [policies were] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." Schneider, 717 F.3d at 771 (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998)). The district court concluded the policies are constitutional; thus, "because [Dawson] has not sufficiently alleged that the Holding and Monitoring Policies' weekend detention requirement caused a violation of his substantive due process right to be free from unreasonably prolonged pretrial detention, [Dawson] has not met the requirements for municipal entity liability." App., at 151.

*C. Substantive Due Process*

Dawson argues that a substantive due process analysis consists of three strands. Aplt. Opening Br., at 9. These strands, Dawson contends, comprise: (i) "infringement of a fundamental right where the infringement is not narrowly tailored to serve a compelling governmental interest;" (ii) "infringement of a non-fundamental right where the infringement is not reasonably related to a legitimate governmental interest;" and (iii) "infringement of any constitutionally protected right in a manner that 'shocks the conscience.'" Id. at 9–10. Dawson claims that if a non-fundamental right is implicated and an official policy exists, "the 'reasonably related' standard applies," and the "shocks the conscience" standard does not apply. Aplt. Reply, at 11–12. Dawson argues the Supreme Court has applied the "shocks the conscience" standard in certain cases because official policies did not exist in those

9

cases. Thus, because official policies exist in this case, Dawson contends that only strands (i) and (ii) are potentially applicable. Aplt. Opening Br., at 5.

Dawson reaches the proper conclusion but for the wrong reason. The Supreme Court has carefully delineated fundamental rights and applies strict scrutiny to those rights. Obergefell v. Hodges, 135 S. Ct. 2584, 2597 (2015) ("The fundamental liberties protected by th[e] [Due Process] Clause include most of the rights enumerated in the Bill of Rights . . . . [and] certain personal choices central to individual dignity and autonomy."). In stark contrast, the Court applies rational basis review to non-fundamental rights, precisely because they are non-fundamental—not because a defendant acted pursuant to an official policy. Thus, the Supreme Court begins the substantive due process inquiry by first defining the "type" of right at stake. Washington v. Glucksberg, 521 U.S. 702, 703 (1997). Once that baseline is established, the Court applies the level of review that corresponds to the right identified.

In Seegmiller v. LaVerkin City, we described this analysis: "First, we must 'careful[ly] descri[be] . . . the asserted fundamental liberty interest.'" 528 F.3d 762, 769 (10th Cir. 2008) (quoting Glucksberg, 521 U.S. at 721). "Second, we must decide whether the asserted liberty interest, once described, is 'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed,'" which would render the liberty interest a fundamental right. Id. (quoting Glucksberg, 521 U.S. at 721). The plaintiff has the "burden of proving the liberty interest" at

10

issue is fundamental and therefore "must be protected through a heightened scrutiny analysis." Id. at 770. And, "[a]bsent a fundamental right, the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest."[6] Id. at 771.

*1. Description of the Asserted Interest*

We begin by "carefully describ[ing] the right [at stake] and its scope." Id. at 769; see also Dias v. City and Cty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009). Dawson alleges an infringement on his right to be free from pretrial detention after he fulfilled the court ordered release conditions within his control; that is, he paid the required bond.

---

[6] However, Seegmiller also deviates from the proper framework in one regard. Seegmiller states the "shocks the conscience" and the rational relation substantive due process inquiries are one and the same: "The Supreme Court has described two strands of the substantive due process doctrine. One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience." 528 F.3d at 767.

Yet, the Supreme Court has noted that the "shocks the conscience" standard pertains to the requisite state of mind for Section 1983 liability and applies in limited situations (not relevant here)—such as when defendants act during emergencies. See Lewis, 523 U.S. at 836 ("The issue in this case is whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate indifference or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender. We answer no, and hold that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."); see also id. at 839 (discussing also how "a much higher standard of fault than deliberate indifference has to be shown for officer liability in a prison riot").

*2. Is the Asserted Interest Fundamental or Non-Fundamental?*

We next ask whether the interest Dawson asserts "is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Dias, 567 F.3d at 1181 (quoting Glucksberg, 521 U.S. at 720–21). We are guided by Bell v. Wolfish, 441 U.S. 520 (1979); United States v. Salerno, 481 U.S. 739 (1987); Gaylor v. Does, 105 F.3d 572 (10th Cir. 1997); and Dodds, 614 F.3d 1185, and conclude that Dawson's interest to be free from pretrial detention, having fulfilled the court ordered release conditions within his control and awaiting the fulfillment of court ordered release conditions outside of his control, is a non-fundamental right.

The Supreme Court in Wolfish addressed conditions of confinement—an issue distinct from the one before us. However, Wolfish provides guidance for our constitutional inquiry. In Wolfish, the Second Circuit concluded, "the Due Process Clause requires that pretrial detainees 'be subjected to only those restrictions and provisions which . . . are justified by compelling necessities of jail administration,'" because "an individual is to be treated as innocent until proven guilty." 441 U.S. at 531 (some quotations omitted) (quoting Wolfish v. Levi, 573 F.2d 118, 124 (2d Cir. 1978)). Thus, the Second Circuit held, "deprivations of the rights of detainees cannot be justified by the cries of fiscal necessity . . . [or] administrative convenience." Id. (quotations omitted). The Supreme Court disagreed. Id. at 532.

The Court's directive pertaining to the constitutional analysis of confinement conditions applies with equal force here:

12

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. . . . [T]he Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

Id. at 536–37 (footnote omitted). The Court continued:

A court must decide whether the disability [imposed by the government] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Id. at 538 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–69 (1963)) (footnotes and citations omitted).

The Court also stated that the government's legitimate interests are not limited to assuring a detainee's presence at trial. Id. at 540. "The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained"—that is, "legitimate operational concerns." Id. The Court instructed:

13

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Id. at 547.

Eight years later, the Supreme Court in Salerno examined the right to be free from pretrial detention based on a challenge to the Bail Reform Act of 1984. The Court analyzed the Act under rational basis review and concluded "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." 481 U.S. at 749. The Court stated, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." Id. at 746. The Court reiterated its previous holdings "that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest," id. at 748, "prior to or even without criminal trial and conviction," id. at 749. Importantly, in so reiterating, the Court refused to "categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Id. at 751 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105 (1934)).

Wolfish and Salerno laid the foundation for this court's rulings which followed. In Gaylor, the plaintiff remained incarcerated for five days without a hearing before a magistrate judge and without information about his bail status

14

(despite the fact that a magistrate had set plaintiff's bail the day following his arrest).

105 F.3d at 574. In analyzing plaintiff's asserted interest to be free from pretrial detention, "we consider[ed] whether the policy in question 'punished' [plaintiff] by infringing his liberty interest unreasonably and in a way unrelated to a legitimate goal, such as insuring his appearance for trial or protecting others from him." Id. at 576–77. Defendants failed to assert a legitimate goal "for a policy of informing a detainee of his bond status only 'if he asks for same,'" id., and we concluded that because "no legitimate goal [wa]s suggested[,] . . . . [t]he restriction or condition was not 'reasonably related to a legitimate goal' . . . and it appear[ed] 'arbitrary or purposeless' under" Wolfish, id. at 578. The policy was therefore "punishment." Id.

Finally, in Dodds, the plaintiff-arrestee alleged that a former county sheriff "violated [plaintiff's] Fourteenth Amendment due process rights by depriving him of his protected liberty interest in posting bail" where a county policy prevented plaintiff from posting bail after working hours and from posting bail until he had appeared before a judge and had been arraigned. 614 F.3d at 1189–90. We analyzed the arrestee's interest in pre-conviction liberty under rational basis review:

> To avoid depriving an arrestee of due process, the government may only interfere with [his] protected liberty interest, for instance by refusing to accept lawfully set bail from the arrestee and detaining him until some later time, if its actions reasonably relate 'to a legitimate goal.' Otherwise, the detention of such an arrestee would constitute punishment prior to trial, in violation of due process.

Id. at 1192–93 (citation omitted); see also Meechaicum v. Fountain, 696 F.2d 790, 792 (10th Cir. 1983) ("[B]ail may not be denied 'without the application of a

15

reasonably clear legal standard and the statement of a rational basis for the denial.'" (citation omitted)). Similar to Gaylor, we concluded in Dodds that plaintiff plausibly pled a violation of his constitutional rights because defendant had not "proffer[ed] any reason, let alone a 'legitimate goal,' for refusing to allow [p]laintiff to post bail and detaining [p]laintiff for three days." Id. at 1193.

With this legal backdrop, we conclude that Dawson's asserted right to be free from pretrial detention having paid court-ordered bond, but awaiting the fulfillment of another court ordered release condition, is not a fundamental right. Rather, Dawson asserts a non-fundamental liberty interest. Thus, so long as the policies which caused his continued detention are not "imposed for the purpose of punishment," Wolfish, 441 U.S. at 538, but instead reasonably relate to a legitimate governmental objective, id., the policies are constitutional and Dawson's claims fail.

*3. Rational Basis Review*

Having determined that Dawson's stated interest is a non-fundamental right, we ask whether its infringement is reasonably related to a legitimate governmental interest.

In contrast with Gaylor and Dodds, defendants-appellees have listed numerous interests which they contend are legitimate governmental interests: (i) conserving money and effort, Aplt. Opening Br., at 20; (ii) coordinating electronic monitoring services and/or mental health competency evaluations, Aple. Br., at 32; (iii) monitoring defendants for victim and/or public safety, id.; (iv) obtaining administrative convenience and efficiency, App., at 148; (v) honoring court orders

16

and following state laws, Aple. Br., at 32; (vi) assuring a defendant's appearance for trial, (vii) efficiently coordinating between different governmental entities, and (viii) obtaining prison security, Aplt. Reply, at 18–19 (citing Aple. Br., at 30–33).

Dawson concedes these are legitimate governmental purposes and interests, and that GPS monitoring policies generally serve these purposes and interests. Aplt. Reply, at 18–19. But Dawson argues none of defendants-appellees interests are "reasonably served by the specific aspect of the Policies that requires a detainee who posts his bond after 1:00 p.m. on a Friday to wait in jail for three days for a GPS fitment procedure that—according to the Policies—routinely takes only a few hours." Id. at 19 (emphasis omitted). But, contrary to Dawson's views, we recognize that the policies do further the legitimate governmental interest of obtaining administrative convenience by eliminating the need for county staff to coordinate with an outside vendor over the weekend to achieve the fitment. The goal of obtaining administrative convenience goes hand-in-hand with the additional legitimate governmental objective of effectively coordinating between different governmental offices.

> More than twenty steps are needed to provide an arrestee with a GPS monitor.
>
> These steps include coordination between the Pretrial Services Unit of Justice Services and the Sheriff's Office; notification to victims and witnesses of a detainee's release prior to release, which itself may include contact with the District Attorney's Office and/or victim/witness services; setting of GPS exclusion zones for each location from the detainee is restrained based on information from victims or without victim assistance if Pretrial Services Unit is unable to make contact with alleged victim(s); notification to the detainee of the details of the program and the exclusion zones to which he or she is subject;

verification of the detainee's contact information, which the detainee must supply for independent verification by Pretrial Services; completion of GPS vendor-related paperwork; documentation of all steps taken under the Policies.

Aple. Br., at 32–33.

It is true that Monday through Thursday two to three hours are sufficient to complete these enumerated steps. Thus, the record and the policies themselves indicate the GPS fitting process, while multi-step, is not extremely time consuming, and that defendants-appellees do not need an entire weekend to fit arrestees with GPS devices. However, under rational basis review, it is more convenient for the Jail to refrain from engaging in a multi-step GPS fitting process and from coordinating with an outside GPS vendor—regardless of how little time the process demands—over the weekend when relevant staff are not available. Thus, the policies rationally relate to at least one legitimate governmental goal. Because the policies are rationally related to defendants-appellees' legitimate interest of obtaining administrative convenience, the policies are not arbitrary or purposeless, nor do they amount to punishment. Thus, as Dawson has no support for his due process claim, he also cannot meet the requirements for § 1983 liability.

### III

We therefore AFFIRM the district court.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

18

17-1118 *Dawson v. Jefferson County*

**TYMKOVICH**, C.J., concurring.

I join Judge Briscoe's opinion. I write separately only to discuss Tenth Circuit jurisprudence for evaluating substantive due process claims.

### I. Substantive Due Process

The Fourteenth Amendment commands that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Courts have interpreted this to mean states cannot deprive a person of life, liberty, or property without providing fair procedures. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976).

Yet the Supreme Court has held this interpretation does not adequately address the full spectrum of interactions arising between citizens and their government. Accordingly, the due process guaranteed by the Fourteenth Amendment covers "more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). There is a "substantive" aspect too, through which the Clause "protect[s] against arbitrary and oppressive government action." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998)).

There are two ways a state's action might be arbitrary enough to violate substantive due process. First, when a state law infringes a *right* without sufficient justification. Second, when state officials deprive a person of life, liberty, or property in a way *so arbitrary that it "shocks the conscience." See*

*United States v. Salerno*, 481 U.S. 739, 746 (1987) ("[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience *or* interferes with rights implicit in the concept of ordered liberty." (internal quotation marks and citations omitted; emphasis added)).

The Supreme Court has developed two strands of jurisprudence to address these two challenges to state action. Under the 'rights' line of substantive due process cases, a state must have a constitutionally sufficient reason before its legislation can interfere with rights to life, liberty, or property. How good a reason a state needs depends on how important the right is. When the right asserted is not "fundamental," a state need only have a legitimate interest reasonably related to the legislation that interferes with those rights. *Glucksberg*, 521 U.S. at 722. But if the right is "fundamental," the state's interference must be "narrowly tailored" to serve a compelling interest. *Id.* at 721.

The second strand of substantive due process law addresses arbitrary conduct by a state official or entity. Because every kind of tort imaginable could become a due process violation if perpetrated by a state actor, "only the most egregious official conduct" can give rise to this kind of substantive due process violation. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Supreme Court has therefore held that a government official's conduct depriving a person of life, liberty, or property violates substantive due process only if it "shocks the conscience." *Id.*

2

## II. *Challenging Government Action*

The parties in this case disagree about how courts apply the 'rights' approach and the 'shocks the conscience' approach. They are not the only ones. The Supreme Court itself has vacillated to and fro. And the circuits have adopted varying approaches.[1] Our Circuit has settled on the following solution: if the case involves a *legislative act*, only the 'rights' strand applies. *Dias v. City & County of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). On the other hand, when the case involves *executive action* by a government official or entity, we apply the 'shocks the conscience' test. *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 & n.1 (10th Cir. 2015) (negligence context).

Although the distinction between the two tests was not always clear, the Supreme Court attempted to draw a bright line in *County of Sacramento v. Lewis*, 523 U.S. at 846–49. The "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer

---

[1] *Compare Hancock v. Cty. of Rensselaer*, 882 F.3d 58 (2d Cir. 2018) (explaining the court applies the 'rights' approach to legislation and the 'shocks the conscience' test to executive action), *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 547 (6th Cir. 2012) (explaining the two strands of substantive due process and noting that for executive action to violate substantive due process, it must shock the conscience), *with Slusarchuk v. Hoff*, 346 F.3d 1178, 1181–82 (8th Cir. 2003) (explaining that plaintiff challenging executive action must satisfy *both* the 'rights' test and the 'shocks the conscience' test to prevail), *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (same), *and Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (suggesting both tests could apply as alternatives in any given case).

3

that is at issue," the Court explained. *Id.* at 846. When a claim involves the specific act of a government officer, courts must first determine whether the officer's conduct was egregious enough to shock the conscience. *Id.* at 847 n.8. *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1788 (2012) (explaining *Lewis*'s holding "that substantive due process claims against the executive—usually law enforcement officers—are governed by a 'shocks the conscience' test"). Conduct "shocks the conscience" when it demonstrates such "a degree of outrageousness and a magnitude of potential or actual harm" that it "'shocks the conscience of federal judges.'" *Uhlrig v. Harder*, 64 F.3d 567, 573–74 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)).

But *Lewis* left some questions unanswered. The Court did not make clear whether the 'rights' approach could still be applied in a case involving executive conduct that shocked the conscience. Then, in *Chavez v. Martinez*, 538 U.S. 760 (2003), a three-justice plurality applied both the 'shocks the conscience' approach *and* the 'rights' approach in a case involving a coerced confession. *Id.* at 774–76. It thus appeared at least a few members of the Supreme Court thought both tests could be used to evaluate executive action.

In *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008), a post-*Chavez* case, we took this approach. Relying on *Chavez*, we reasoned that "[a]lthough some precedential support exists for the executive versus legislative

4

distinction," the Supreme Court had not followed "an overly rigid demarcation between the two lines of cases." *Id.* at 767. We also relied on an earlier Tenth Circuit case explaining that "[w]hile the shocks the conscience standard applies to tortious conduct challenged under the Fourteenth Amendment," it does not "eliminate more categorical protection for fundamental rights as defined by the tradition and experience of the nation." *Id.* at 769 (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003)). Our court thus concluded the tests were "not mutually exclusive" and "[b]oth approaches" could "be applied in any given case." *Id.*

A subsequent case, *Dias v. City and County of Denver*, 567 F.3d 1169 (10th Cir. 2009), clarified that *Seegmiller*'s 'both tests work' rationale *only* applied to cases challenging government official conduct, not legislation. The court explained: "[w]e held in *Seegmiller* that application of a 'shocks the conscience' standard in cases involving *executive* action is not to the exclusion of the foregoing ['rights'] framework." *Id.* at 1182 (emphasis in original). But the court "clarif[ied] . . . that when legislative action is at issue," only the 'rights' approach "is applicable." *Id.*

Finally, in *Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015), we explained that *Seegmiller*'s 'both tests work' interpretation of *Chavez* was dicta. *Id.* at 1079 n.1. While we acknowledged that "some question lingers about all this," we reasoned that "*Chavez* did not expressly overrule *Lewis*'s holding

5

that the 'arbitrary or conscience shocking' test is the appropriate one for executive action." *Id.* Consequently, when a case involves government official conduct, the 'shocks the conscience' test is the *only* test we apply.[2]

This makes sense. Though the 'shocks the conscience' test helps limit the number and types of torts by government actors from becoming substantive due process claims, it is too vague to be useful for evaluating the propriety of legislation. Conversely, the 'rights' approach provides a helpful framework for evaluating statutes, but it cannot well distinguish between innocent and egregious government official conduct. Were we to apply the 'rights' approach to every case of negligence resulting in death, we would come close to converting a broad spectrum of merely negligent government conduct into substantive due process violations.

In sum, then, though our circuit has sometimes repeated *Seegmiller*'s 'both tests work' dicta,[3] we do not follow it. Instead, we follow a simple binary

---

[2] This is consistent with the approach of several other circuits. *See, e.g.*, *Hancock v. Cty. of Rensselaer*, 882 F.3d 58 (2d Cir. 2018); *Reyes v. N. Texas Tollway Auth., (NTTA)*, 861 F.3d 558, 562 (5th Cir. 2017); *Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017); *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 547 (6th Cir. 2012); *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005).

[3] *See, e.g.*, *Leatherwood v. Allbaugh*, 861 F.3d 1034, 1046 n.11 (10th Cir. 2017) (explaining both tests could be used in case about revocation of a defendant's suspended sentence); *Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 749–50 (10th Cir. 2013) (explaining both tests could be used to evaluate a claim of wrongful termination); *Pettigrew v. Zavaras*, 574 F. App'x 801, 815 (10th Cir. 2014) (unpublished) (applying both tests to parole board's

6

approach. If a claim challenges executive action, we apply only the 'shocks the conscience' test; if a claim challenges a legislative act, we apply only the 'rights' approach.

### III. The Claims Here

Having explained how the two strands of substantive due process doctrine work and when our court applies them, I turn to their application in this case.

The facts are simple. As Judge Briscoe recounts, police arrested Kenneth Jerome Dawson for violating a restraining order and kept him in custody at the Jefferson County Jail. Because of County policy, the Jail did not fit Dawson with a GPS tracker over the weekend, and he remained in jail. Dawson argues application of this policy to his circumstances violated his substantive due process right to freedom from bodily restraint.

To state a claim for municipal liability against the County, Dawson must allege the existence of (1) an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury alleged; and (3) deliberate indifference on the part of the municipality. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir.2013). "[A] formal regulation or policy statement" qualifies as an official policy or custom. *Bryson*

_____

denial of relief); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (explaining an intrusive physical examination could be both a tort that shocks the conscience and a violation of a fundamental right, but concluding the Fourth Amendment provided a more specific source for the right).

7

*v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). And no one disagrees there is a direct link between the policy and Dawson's injury. Thus, since "fault and causation [are] obvious" when a decision "duly promulgated" by the city is unconstitutional, *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 406 (1997), the entire question in this case boils down to whether Jefferson County's enacted policy violated Dawson's substantive due process rights.

Since the Board of County Commissioners adopted the challenged policy by resolution, the policy is legislative. We therefore apply the 'rights' approach under *Dias*. *See* 567 F.3d at 1182.

Under the 'rights' approach, if a government action "burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest," but if it "burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest." *Id.* at 1181 (citing *Glucksberg*, 521 U.S. at 721, 728). Dawson argues the County's policies violated his right to freedom from bodily restraint by causing him to stay in jail over the weekend. He claims that Supreme Court cases establish this right is a fundamental one, and that the administrative convenience the County obtains from its policy is not a sufficiently compelling interest.

Dawson attempts to do here what the Supreme Court cautioned courts to watch out for—he attempts to convert his injury into a violation of a 'fundamental right' by articulating the right at too high a level of generality. It was precisely to

8

prevent this strategy that *Glucksberg* instructs us to look for a "'careful description' of the asserted fundamental liberty interest." 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The right Dawson claims the County violated is not a right to freedom from bodily restraint, writ large, but a right to speedy release from pretrial detention when the only remaining unfulfilled condition for release is within the jail's control.

The Supreme Court has evaluated pretrial confinement schemes under substantive due process doctrine in several cases. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739 (1987); *Schall v. Martin*, 467 U.S. 253 (1984). In those cases, instead of applying strict scrutiny, the Court applied the substantive due process test from *Bell v. Wolfish*, 441 U.S. 520 (1979), which only asks whether the government had a rational basis for its policy or instead meant its policy as punishment, *id.* at 535, 538–39. *See Salerno*, 481 U.S. at 746–47; *Schall*, 467 U.S. at 269. By choosing not to apply strict scrutiny, the Court implied that pretrial confinement not intended as punishment does not infringe a fundamental right.

Indeed, the Court's language in *Bell* strongly indicates strict scrutiny analysis would be wrong in the pretrial detention context. "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," the Court said, "we think that *the proper inquiry* is whether those conditions amount

9

to punishment of the detainee." *Id.* at 535 (emphasis added).

It must be acknowledged, though, the Supreme Court's analysis in *Salerno* was certainly not as clear as it could be.[4]  We are therefore not surprised the Ninth Circuit came to the opposite conclusion recently—holding there is a fundamental right to freedom from pretrial detention.  *See Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014).  Dawson points to that case for support.

I think our analysis is the correct one, however, both for the reasons already stated and for two additional reasons.  First, this case more helpfully places the *Bell*, *Schall*, and *Salerno* line of cases squarely within the overarching substantive due process 'rights' approach the Supreme Court announced in *Glucksberg*.  *See* 521 U.S. at 721, 728.  The Ninth Circuit's conclusion, by contrast, creates an additional, sui generis due process framework.  *See Lopez-Valenzuela*, 770 F.3d at 780 ("We first consider whether the . . . laws satisfy general substantive due process principles . . . [w]e then consider in the alternative whether the . . . laws violate due process, under *Bell*, *Schall* and *Salerno*, by imposing punishment before trial.").  Second, our decision keeps

---

[4]  *Compare United States v. Deters*, 143 F.3d 577, 583 (10th Cir. 1998) (concluding *Salerno* did not clearly find a fundamental right), *with Hoang v. Comfort*, 282 F.3d 1247, 1257 (10th Cir. 2002), *judgment vacated sub nom. Weber v. Phu Chan Hoang*, 538 U.S. 1010 (2003) (concluding in dicta *Salerno* delineated a fundamental right).

federal courts from supervising all pretrial detention policies. Were we to find a right as broad as the Ninth Circuit suggests, all jail procedures relating to bail could become subject to strict scrutiny.

In sum, the right Dawson alleges is best characterized as a non-fundamental right to be free from pretrial punishment. We thus need only apply rational basis scrutiny as directed by *Bell*. And as the majority explains, the County's policy meets that standard. *Cf. Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to deprivation [of due process]").

A weekend in jail is no small burden. The County can likely do better. But its policy does not violate the Constitution.

11