GORSUCH, Circuit Judge.
Adam Casaus was going nowhere fast. After finishing his shift at the Albuquerque police department and on no one’s business but his own, he got into his police cruiser, flipped on the emergency lights, and drove off at an average of about 66 miles an hour on city surface streets through ten different intersections over a stretch of 8.8 miles. Then he reached an eleventh intersection. The light was red. He pressed the gas pedal, ignored the light, and the result was a terrible crash. Ashley Browder died. Her sister, Lindsay, suffered grave injuries. Sergeant Ca-saus eventually found himself criminally charged with reckless vehicular homicide in state court. Now Lindsay and her parents have brought this civil suit seeking damages under 42 U.S.C. § 1983. Sergeant Casaus asked the district court to dismiss the Browders’ complaint on grounds of qualified immunity. The district court declined that relief and so do we.
The Browders’ suit follows this course. Section 1983 permits citizens to sue for any assault on their constitutional rights that occurs “under color of’ state law. The Supreme Court has read this language broadly, as encompassing even *1078 some situations in which state law enforcement officers actually violate state law. Monroe v. Pape, 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). But see Crawford-El v. Britton, 523 U.S. 574, 611, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (Scalia, J., dissenting) (citing Monroe, 365 U.S. at 224-25, 81 S.Ct. 473 (Frankfurter, J., dissenting)). Both sides before us accept that this case involves one of those situations and so we proceed on the same assumption, accepting (without deciding) that Sergeant Casaus’s conduct came “under color of’ state law. Of course, though, that’s just the beginning of things for § 1983 is but a means to an end, a vehicle for bringing claims, and it remains incumbent on the plaintiff to identify some violation of a constitutional (or other federal) right.
In this case, the Browders point to the Fourteenth Amendment. More particularly, they point to the Amendment’s due process clause which prohibits the government from depriving individuals of their lives, liberty, or property without due process of law. The Supreme Court has interpreted this language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations won’t take place without a sufficient justification (substantive due process). Some suggest this latter doctrine with the paradoxical name might find a more natural home in the Privileges and Immunities Clause; others question whether it should find a home anywhere in the Constitution. But, the Supreme Court clearly tells us, home it has and has where it is. At the same time, the Court has warned that the doctrine should be applied and expanded sparingly “because guideposts for responsible deci-sionmaking in this unchartered area are scarce and open-ended.” Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)) (internal quotation mark omitted).
Under what guideposts the Court has so far staked out, our first job in assessing a substantive due process claim is to make a “careful description” of the allegedly violated right. Id. at 721, 117 S.Ct. 2258 (internal quotation marks omitted). Then we must ask whether that right counts as a “fundamental” one, a limited class of rights sometimes described-by the Court as those that can fairly claim to be “objectively, deeply rooted in this Nation’s history and tradition.” Id. at 720-21, 117 S.Ct. 2258 (internal quotation marks omitted); see also Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (describing fundamental rights as those “implicit in the concept of ordered liberty”). Next we must ask whether the government’s alleged infringement of the right in question was “direct[]” and “substantial!].” Zablocki v. Redhail, 434 U.S. 374, 387, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).
If the plaintiffs injury meets these tests we then assess whether the government can muster sufficient justification for its actions. If the government infringed the plaintiffs right through legislative activity, the- Supreme Court has told us to inquire whether the legislation is “narrowly tailored to serve a compelling state interest.” Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (quoting Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)) (internal quotation mark omitted). If the infringement is the result of executive action, the Supreme Court has instructed us to ask whether that action bears a “reasonable justification in the service of a legiti *1079 mate governmental objective” or if instead it might be “characterized as arbitrary, or conscience shocking.” County of Sacramento v. Lewis, 523 U.S. 833, 846, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting Collins, 503 U.S. at 128, 112 S.Ct. 1061). Even if the plaintiff can satisfy these standards, when a state tort suit can provide the same relief as a federal § 1983 claim and there’s no reason to suppose a state court won’t fairly hear the claim it is an open question whether federal courts— though empowered to hear the suit— should abstain in favor of the state remedial processes. See Parratt v. Taylor, 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Lewis, 523 U.S. at 840 n. 4, 118 S.Ct. 1708 (citing Albright v. Oliver, 510 U.S. 266, 281-86, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Kennedy, J., concurring in the judgment)); see also Concurrence, post.[1]
In cases involving executive action like the one before us still another question arises: how are we supposed to go about trying to distinguish executive actions that Lewis describes as “reasonably justified in the service of legitimate governmental objectives” from those it describes as “arbitrary or conscience shocking”? This area remains very much unchartered and the conscience-shocking test does seem (in Glucksberg’s words) more than a little “open-ended,” but the Court has offered us two further thoughts by way of direction.
First, it’s told us to consult history and precedent. See Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708; id. at 857, 118 S.Ct. 1708 (Kennedy, J., concurring); id. at 860-62, 118 S.Ct. 1708 (Scalia, J., concurring in the judgment). The constitutional due process guarantee traces its roots to the Magna Carta and the effort to deny capricious kings the “power of destroying at pleasure,” what Blackstone called the “highest degree” of tyranny. 1 William Blackstone, Commentaries *133. So perhaps it comes as little surprise that we should look to the history of efforts to tame arbitrary governmental action to determine whether and under what conditions the conduct at issue is accepted as a necessary incident of organized society— or whether it is associated with the sort of whimsical sovereign the due process guarantee was designed to guard against.
*1080 Second, the Court has suggested that careful attention to mens rea can help. Lewis, 523 U.S. at 849-50, 118 S.Ct. 1708. Negligence toward a fundamental right, we are told, will never suffice to suggest the sort of caprice that rises to the level of constitutional concern. Meanwhile, in cases where forethought is feasible some form of recklessness to the plaintiffs fundamental right may be enough: our tradition suggests that we can and should usually expect more from the sovereign than deliberate indifference to fundamental rights like life, liberty, and property. Still, in cases where the legitimate governmental objective is so pressing that the luxury of forethought doesn’t exist (e.g., responding to an emergency or dealing with a prison riot), the Court has held that to establish inappropriate caprice even more is required. In these cases even an intent to undertake the act that impairs the plaintiffs fundamental right isn’t enough: a further intent to impair the plaintiffs fundamental right — what’s sometimes called “specific” intent — -is necessary. The Court has adopted this high standard in recognition of the fact that in emergency situations officers face “obligations that tend to tug against each other” — the duty to come to the aid of citizens in distress and the duty to protect the rights of those who may innocently stand in the way — and little time in which to deliberate their resolution. Id. at 853-54, 118 S.Ct. 1708.
Attempting to follow as best we can what guidance we’ve received in this murky area, we believe we can say this much about the case at hand. No one before us disputes that Ashley’s death and the damage done to Lindsay’s person count as direct and substantial impairments of their fundamental right to life, so we can and do take that much as given. And while the line that separates executive actions that are “reasonably justified” in the service of a “legitimate governmental objective” and those that are “arbitrary or conscience shocking” appears anything but clearly defined, this case does not seem to us to implicate any serious borderline disputes. “Arbitrary” actions are those performed capriciously or at one’s pleasure and without good reason. See 1 The Oxford English Dictionary 602 (2d ed.1989); see also Black’s Law Dictionary 119 (9th ed.2009). And on the complaint’s telling at least, Sergeant Casaus’s actions appear the very model of that. He used his official squad car and activated its emergency lights and proceeded to speed through surface city streets at more than 60 miles per hour over 8.8 miles through eleven city intersections and at least one red light — all for his personal pleasure, on no governmental business of any kind.
History and precedent support our conclusion. In a society governed by laws and not men officers acting as private persons on private time have traditionally enjoyed no special immunities for their conduct. See 1 Blackstone, supra, at ch. 9 (setting forth the common law rights of sheriffs and constables and nowhere suggesting any general immunity for their private misconduct); see also Restatement (First) of Torts § 121 cmts. a, c, and e (1934) (officer’s privilege to arrest and thus his conditional exemption from otherwise applicable tort law limited by any jurisdictional and type-of-offense conditions inherent in his appointment). And the sort of conduct alleged here amounts to conduct historically punished as a felony by private persons. See, e.g., N.M. Stat. Ann. § 66-8-101. What’s more, the New Mexico statute empowering police officers to speed and run red lights when pursuing a lawbreaker expressly states that it does not insulate an officer “from the consequences of his reckless disregard for the safety of others.” N.M. Stat. Ann. § 66-7-6(D). And state laws commonly deem it an abuse *1081 for officers to employ their emergency lights or sirens for their own business. See, e.g., N.M. Stat. Ann. § 66-3-843; N.Y. Veh. & Traf. Law § 375(41)(2); 75 Pa. Cons.Stat. Ann. § 4571(e).
Lewis’s mens rea test confirms our conclusion too. Speeding and jumping red lights often may signify no more than negligence — the failure to do what a reasonably prudent person would do. Even in this case we acknowledge a jury might find Sergeant Casaus guilty of no more than that. But on the facts pleaded a reasonable jury could infer something more, a conscious contempt of the lives of others and thus a form of reckless indifference to a fundamental right — precisely the sort of mens rea Lewis says will normally suffice to establish liability. Neither do we think it appropriate to demand specific intent in these circumstances. Lewis held specific intent may be required to suggest arbitrary or conscience-shocking behavior in cases where the officer has been asked to respond to emergencies of citizens in need. But the case never suggested that such a demanding form of mens rea is necessary or appropriate to suggest arbitrary or conscience-shocking conduct in cases where the officer isn’t pursuing any emergency or any official business at all. And for good reason. The officer in these circumstances faces no tug between duties owed to two sets of innocents, there is no emergency, no one has called for his aid, and he sits instead in the same place as everyone else when it comes to respecting the rights of others.
In response to this analysis Sergeant Casaus offers three main rejoinders and forgoes another. The one he forgoes is perhaps the most significant. According to the complaint, Sergeant Casaus’s conduct wasn’t authorized by any state rule, policy, or custom and — as we’ve noted — it’s an open question in cases like this whether Parrott requires the plaintiff to show that state law supplies no adequate remedial course before proceeding in federal court. See supra at 1078-79; Concurrence at 1085. But instead of pursuing a line of defense that would require him to accept that he acted without any legal authorization, Sergeant Casaus has chosen instead to pursue a defense in precisely the opposite direction (as we will see in a moment). In light of this tactical decision, we deem any Parrott argument forfeited and reserve for another day the question whether it applies to substantive due process claims — the very course the Supreme Court itself charted when the defendant in Lewis similarly failed to raise a Parrott argument. 523 U.S. at 840 n. 4, 118 S.Ct. 1708.
When it comes to the defense Sergeant Casaus does attempt — claiming that he was acting on official business — we encounter a different problem. The officer insists that at the time of the accident he was pursuing another car operating in a dangerous manner. If true, of course, this could constitute a “reasonable justification for conduct in service of a legitimate governmental'objective,” for Lewis suggests specific intent to infringe the rights of others may be required to push a case like that into the realm of the arbitrary or conscience-shocking- — -and no one before us claims Sergeant Casaus bore such a mens rea. See, e.g., Green v. Post, 574 F.3d 1294, 1301-10 (10th Cir.2009). But the problem with this defense in this case is that requires us to disregard the complaint’s well-pleaded facts. The complaint expressly contends that Sergeant Casaus was pursuing no official business of any kind. And it backs this contention with facts, alleging that the officer didn’t call or radio dispatch to relate any infraction by any other driver, though police policy required him to do so. And alleging that an eyewitness to events says Sergeant Casaus wasn’t following anyone at the time of the *1082 crash. Perhaps the officer might convince a jury otherwise at trial. But it’s our duty at this stage to take the well-pleaded facts as true and draw every inference in the Browders’ favor. And viewing the complaint in that light, we don’t doubt the Browders have stated a plausible claim for relief.
Attempting a different tack, Sergeant Casaus says the undisputed fact that he activated his emergency lights (but not his siren) establishes as a matter of law he wasn’t acting recklessly. But we cannot agree with this argument either. We don’t doubt that an officer using his lights and sirens on official business usually does so at least in part to ensure the safety of others, or that this conduct may go a long way in many cases toward disproving any specific intent to harm bystanders. But neither is it the case that officers who go drag racing down Main Street on their own time only have to flip on their lights or sirens to immunize themselves from any responsibility for the accidents they cause. Certainly Sergeant Casaus cites no authority for such a remarkable claim and, as we’ve seen, a good deal of precedent and history suggests the opposite view. See supra at 1080-81. Indeed and again, we do not doubt that, when an officer uses his emergency lights on his business and not the public’s and goes racing through traffic lights, a reasonable jury could conclude that his conduct amounts to an abuse of power; a demand that others get out of his way so he might pursue his personal business before they might pursue theirs; and, when added to the other facts present in this case, a reckless indifference to the lives of others.
Finally, Sergeant Casaus says he didn’t have time enough to form a reckless indifference to human life. He didn’t, he says, because it took him only 2.5 seconds to travel through the intersection before impact. But even assuming (without granting) the requisite mens rea couldn’t be formed in that short period, Sergeant Ca-saus here again impermissibly asks us to view the facts in the light most favorable to him rather than the Browders. On the facts alleged, after all, one could just as easily conclude that the officer had more like eight minutes than 2.5 seconds to reflect on his actions — from the time he started driving at high speed on city surface streets through eleven intersections over 8.8 miles until the time of the crash.
Having determined that, taking the facts alleged as true, Sergeant Casaus violated the constitutional rights of Ashley and Lindsay Browder one more question still remains: were those rights clearly established at the time at issue in this case such that “every reasonable official would have understood that what he [was] doing” violated them? Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (internal quotation mark omitted). Unless we can say so much, Sergeant Casaus rightly reminds us, he remains entitled to qualified immunity, whatever he may have done.
In deciding the “clearly established law” question this court employs a “sliding scale” under which “the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.” Shroff v. Spellman, 604 F.3d 1179, 1189-90 (10th Cir.2010) (alteration omitted) (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1161 (10th Cir.2008)) (internal quotation marks omitted). After all, some things are so obviously unlawful that they don’t require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional con *1083 duct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt. See Northen v. City of Chicago, 126 F.3d 1024, 1028 (7th Cir.1997) (“[T]he police cannot obtain immunity for liability for false arrests by arresting people on preposterous charges and then pointing to the absence of any judicial decision that declares the statutory interpretation underlying the charges to be preposterous.”).
Ours is perhaps a case along these lines. We’ve encountered plenty of cases involving officers responding to emergency calls who unintentionally cause traffic accidents. But we haven’t encountered many cases involving deadly traffic accidents with officers speeding on their own business — presumably (hopefully) because such things happen rarely. Even so, the Supreme Court and this court have both spoken unmistakably to this situation. In Lewis, the officer was using his police car to respond to an emergency and the Court held he didn’t violate the Constitution. But the Court also expressly noted when a private person suffers a serious physical injury “ ‘due to a police officer’s intentional misuse of his vehicle’” a viable due process claim can arise. 523 U.S. at 854 n. 13, 118 S.Ct. 1708 (quoting Checki v. Webb, 785 F.2d 534, 538 (5th Cir.1986)). As early as 1996, this court warned that an officer who kills a person while speeding at 60 miles an hour on surface streets absent any emergency and in violation of state law invites a Fourteenth Amendment claim. Williams v. City and County of Denver, 99 F.3d 1009 (10th Cir.1996), vacated, 140 F.3d 855 (10th Cir.1997). Though this court eventually vacated the Williams panel decision and remanded the case for reconsideration in light of Lewis, the result proved the same in the end precisely because Lewis itself made the same point the Williams panel had. See Williams v. City and County of Denver, Civ. Act. No. 90 N 1176, at 16 (D.Colo. Sept. 28, 1999). Indeed, in Green this court noted Williams’s warning with approval. 574 F.3d at 1298 n. 5. And it proceeded to hold that, as of'2006, it was clearly established “a police officer could be liable under the Fourteenth Amendment” for driving in a manner that exhibits “a conscience-shocking deliberate indifference” to the lives of those around him. Id. at 1306. Taken collectively, we believe all this .was more than enough to make clear to any reasonable officer in 2013 (the time of the accident) that the conduct alleged here could give rise to a claim under the Fourteenth Amendment.[2]
The district court’s decision is affirmed and the case is remanded for further proceedings consistent with this opinion.

. Lewis indicated that its standard for executive conduct is intended to be even more demanding than the Glucksberg standard for legislative action. Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708. You might ask why — why has the Court devised different tests for measuring the propriety of infringements on fundamental rights depending on the offending governmental agent? Perhaps the answer lies in the fact that legislation touching on fundamental rights is clearly state action and clearly affects the liberty of an entire class of persons while executive action infringing- fundamental rights can often come by way of isolated and unauthorized conduct by individual rogue executive agents against individual citizens. Both forms of conduct may be actionable under Monroe, but perhaps the Court wishes to suggest that the latter is a more attenuated form of state action that may warrant greater scrutiny before it is held to rise to a level of constitutional concern. Admittedly, some question lingers about all this. In Chavez v. Martinez, a three-justice plurality seemed to employ both the "legislative” and "executive” tests in a case challenging executive action. 538 U.S. 760, 774-76, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). What exactly this means is unclear. Perhaps the Court meant to allow plaintiffs to choose a test. See Seegmiller v. LaVerkin City, 528 F.3d 762, 767-68 (10th Cir.2008) (suggesting as much but only in dicta). Perhaps the Court meant only to suggest that the plaintiff before it was destined to lose under any possible test. Perhaps it is impossible to know what such a splintered Court meant. All we can say with certainty is that Chavez did not expressly overrule Lewis’s holding that the "arbitrary or conscience shocking” test is the appropriate one for executive action so we feel obliged to apply it.

. Although the City of Albuquerque joins Sergeant Casaus’s appeal, it argues only that he didn't violate the Constitution for the reasons we’ve already considered and rejected. We don’t doubt the City could have raised additional lines of defense — see Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) — but for whatever reason it chose not to do so and once again we decline to pass on potential arguments not presented.