**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JUAN HERNANDEZ; NATHAN
VELASQUEZ; FRANK VELASQUEZ;
MARK DOERING; MARY DOERING;
BARBARA ARIGONI; DUSTIN HAINES-
SCRODIN; ANDREW ZAMBETTI;
CHRISTINA WONG; CRAIG PARSONS;
I.P., a minor individual; GREG
HYVER; TODD BROOME; DONOVAN
ROST; MICHELE WILSON; COLE
CASSADY; THEODORE JONES;
MARTIN MERCADO; CHRISTOPHER
HOLLAND; RACHEL CASEY,
            *Plaintiffs-Appellees*,

v.

CITY OF SAN JOSE, a municipal
corporation; LOYD KINSWORTHY;
LISA GANNON; KEVIN ABRUZZINI;
PAUL MESSIER; PAUL SPAGNOLI;
JOHNSON FONG; JASON TA,
            *Defendants-Appellants*.

No. 17-15576

D.C. No.
5:16-cv-03957-
LHK

OPINION

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted April 9, 2018
San Francisco, California

Filed July 27, 2018

Before: Dorothy W. Nelson, Andrew J. Kleinfeld,
and William A. Fletcher, Circuit Judges.

Opinion by Judge D.W. Nelson

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's denial of qualified immunity to police officers and dismissed the City of San Jose's appeal in a 42 U.S.C. § 1983 action brought by attendees of a political rally for Donald Trump who were attacked by anti-Trump protesters as they attempted to leave the rally.

The panel held that based on the allegations in the operative complaint, which the panel took as true on a motion to dismiss, the attendees alleged sufficiently that the officers increased the danger to them by shepherding them into a crowd of violent protesters and that the officers acted with deliberate indifference to that danger. The district court therefore correctly denied the officers qualified immunity. As for the attendees' claim against the City, the panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

declined to exercise jurisdiction over it because it was not inextricably intertwined with the qualified immunity issue.

## COUNSEL

Matthew Pritchard (argued), Deputy City Attorney; Ardell Johnson, Chief Deputy City Attorney; Nora Frimann, Assistant City Attorney; Richard Doyle, City Attorney; Office of the City Attorney, San Jose, California; for Defendant-Appellants.

Harmeet K. Dhillon (argued), Dhillon & Smith LLP, San Francisco, California, for Plaintiff-Appellees.

## OPINION

D.W. NELSON, Senior Circuit Judge:

The City of San Jose ("City") and seven of its police officers ("Officers") (collectively, "City Defendants") appeal the district court's denial of their Motion to Dismiss ("Motion") in favor of several individuals who attended a rally in 2016 for then-Presidential candidate Donald J. Trump ("Attendees").[1] The City Defendants contend the court erred

---

[1] The "Officers" are Loyd Kinsworthy, Lisa Gannon, Kevin Abruzzini, Paul Messier, Paul Spagnoli, Johnson Fong, and Jason Ta. The "Attendees" are Juan Hernandez, Nathan Velasquez, Frank Velasquez, Rachel Casey, Mark Doering, Mary Doering, Barbara Arigoni, Dustin Haines-Scrodin, Andrew Zambetti, Christina Wong, Craig Parsons, I.P., a minor, Greg Hyver, Todd Broome, Martin Mercado, Christopher Holland, Theodore Jones, Donovan Rost, Michele Wilson, and Cole Cassady.

when it (1) denied the Officers qualified immunity, and (2) held the Attendees had stated a claim for municipal liability under 42 U.S.C. § 1983 against the City. Taking the allegations in the operative complaint as true, and reading them in the light most favorable to the Attendees, we find the Officers violated clearly established rights and are not entitled to qualified immunity at this stage of the proceedings. We also find the City's liability is not inextricably intertwined with the Officers' liability, and we therefore lack jurisdiction over the City's appeal. We affirm the district court's denial of qualified immunity to the Officers and dismiss the City's appeal.

## BACKGROUND

### I.  The First Amended Complaint

On June 2, 2016, Trump held a political rally ("Rally") at the McEnery Convention Center ("Convention Center") in San Jose, California. The San Jose Police Department ("Police Department"), along with the U.S. Secret Service, expected between 12,000 and 15,000 people to attend, and the event was to run from 7:00 p.m. to 8:30 p.m.

The Police Department was aware that Trump rallies in other cities had "spurred violent anti-Trump protests," and it took several steps to prepare for the Rally. Among other things, the City "requested between [50] and [70] additional officers" through "designated mutual aid . . . channels to staff the Rally," accepted "additional officers and vehicle support" from other police departments in the area, and fitted many of the officers with riot gear. About 250 officers patrolled the Rally on June 2, 2016.

According to the First Amended Complaint ("FAC"), the City "normal[ly] [implements a] 'zero tolerance' approach to violent protesters[] by making targeted arrests during the protests." But here, the City took an "entirely different" approach: "the City Defendants instructed all officers to stand by, watch as the attacks occurred, and not intervene" because "intervention might cause a riot." The Attendees claim the Officers looked on as they were "battered by several anti-Trump protesters, including, in some instances, being struck in the head and face, kicked in the back, spat upon, and otherwise harassed and assaulted."

Significant to this appeal, the Attendees allege the Officers "[d]irect[ed] [them] into the [m]ob of [v]iolent [p]rotesters" waiting outside the Convention Center. As part of their crowd-control plan, the Officers only allowed the Attendees to "leave from the east-northeast exit of the . . . Convention Center" and "actively prevented [them] from leaving through alternative exits." "Upon exiting the [C]onvention [C]enter, the [A]ttendees were met with a police skirmish line, composed of and/or controlled by the [Officers]." "The [O]fficers in this line required the [Attendees] to turn north as they left the [C]onvention [C]enter, and to proceed along Market Street, into the crowd of violent anti-Trump protesters." The Officers "actively prevented the . . . [A]ttendees from proceeding south . . . , away from the anti-Trump protesters, or from leaving the [C]onvention through alternative exits." The Officers "instructed other police officers" to direct the Attendees in the same manner. Many of the Attendees "were beaten, victimized by theft, and/or had objects such as bottles and eggs thrown at them" as a result.

Two Attendees—Hernandez and Haines-Scrodin—claim that San Jose police "directed [them] to walk through the anti-Trump protesters, rather than . . . allow[ing] [them] to turn south, in the direction of safety." "Soon after following the[se] directions . . . , [they] were struck repeatedly in their faces and heads by anti-Trump protester, Victor Gasca." "Several other anti-Trump protesters also battered Hernandez and Haines-Scrodin, while Gasca kept up his assault." As a result, "Hernandez suffered a broken nose [and several] abrasions," and "Haines-Scrodin . . . suffered [various] bodily injuries."

Another Attendee, I.P., claims he experienced similar violence due to the City Defendants' poorly conceived crowd-control plan. Just like Hernandez and Haines-Scrodin, he "exited the east-northeast exit of the . . . Convention Center, where a line of police officers prevented [him] from turning right, to safety" and instead "directed [him] to turn left, into the anti-Trump protesters." "I.P. was struck in the back of his head" by one protester and "tackled . . . to the ground" by another." "After being attacked, I.P. made his way [back] to [the] police skirmish line, and was only later allowed to cross the line to safety."

According to the Attendees, the Officers were clearly aware of the violence outside the Convention Center. "In fact, as early as [6 p.m.] the day of the Rally, the San Jose police warned all officers deployed around [the] Rally that assaults had already been reported outside the [Convention Center]." During the Rally, the Officers witnessed the violence firsthand, or were at least informed of it, but they did nothing.

San Jose Police officers on the scene "arrested only three individuals" during the Rally, "each of whom allegedly assaulted and/or battered police officers." They made "no arrests at the Rally in connection with the dozens of similar criminal acts committed against [the Attendees]."

After the Rally, San Jose Police Chief Edgardo Garcia ("Chief Garcia") "publicly commend[ed] the [police] officers' actions" and "lauded [them for showing] 'discipline.'" Chief Garcia further stated "'additional force can incite more violence in the crowd'" and that the officers at the Rally "'should be commended for both their effectiveness and their restraint.'" Chief Garcia did not discipline the Officers for their conduct during the Rally.

Based on these allegations, the Attendees brought a class action against the City Defendants alleging, among other things, a § 1983 due process claim against the Officers and a § 1983 due process claim against the City under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

## II. The District Court's Order Denying Qualified Immunity

The City Defendants argued in their Motion to Dismiss that (1) the Officers were entitled to qualified immunity and (2) the City was not liable for the Officers' actions pursuant to *Monell*. The district court denied the Motion on both counts. *Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 976, 980 (N.D. Cal. 2017).

### A. Qualified Immunity

In denying the Officers qualified immunity, the court first found the Attendees had sufficiently stated their § 1983 claims against the Officers. *Id.* at 973–75. The court considered two potential theories of liability. *See id.*

The first concerned whether the Officers were liable for "devis[ing]" the allegedly ineffective crowd-control plan. *Id.* at 973. Because the Attendees "[failed to] allege[] that those who created the crowd-control [plan] knew that [leading the Attendees on] the designated path would *increase* the danger to [them]," the Officers were not liable for their planning efforts before the Rally began. *Id.* at 973–74.

The Attendees' second theory under § 1983 concerned the Officers' actions on the night of the Rally—"despite knowing that violence had already broken out and was likely to continue, . . . the police officers continued to direct the Rally attendees into the mob, den[ied] [them] the ability to exit through alternative paths, and refuse[d] to direct the officers under their control to do so." *Id.* at 974 (citation and internal quotation marks omitted). The district court concluded that the Officers knew as early as 6 p.m. that evening that anti-Trump protesters had attacked people at the Rally. *See id.* Because the Officers "were present at or around the Trump Rally," they were clearly "aware that the crowd-control plan was putting [the Attendees] in danger." *Id.* The court held that the Attendees had "stated a claim against the police officers for continuing to direct [the Attendees] into a dangerous area after the police officers became aware that the crowd-control plan was subjecting [them] to an increased risk of harm by anti-Trump protesters." *Id.* at 975.

Next, the court considered whether the Attendees' rights were clearly established at the time of the Rally such that the Officers should have known their conduct was unconstitutional. *See id.* at 975–76. The court noted that the theory on which the Attendees based their claims—that the Officers had created the danger and acted with deliberate indifference to their safety—was established in the Ninth Circuit "over ten years ago" in *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006). *Hernandez*, 241 F. Supp. 3d at 975–76. The court also found that *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) "made clear that the state-created danger doctrine applies to the conduct at issue in this case" and that the Attendees' rights were clearly established. *Hernandez*, 241 F. Supp. 3d at 976 (citation omitted). Accordingly, the court denied the Officers qualified immunity. *Id.*

## B. *Monell* Liability

The district court also found the Attendees had stated a claim against the City under *Monell* for ratifying the unconstitutional conduct of its Officers. *Id.* at 980. According to the FAC, "Chief Garcia ratified the [Officers'] unconstitutional acts by publicly declaring his support for those actions and by failing to reprimand [them] for their conduct." *Id.* at 977 (citation and internal quotation marks omitted). Because "Garcia allegedly made 'statements . . . tending to show that [he] endorsed or approved the unconstitutional conduct of individual officers,'" the Attendees had in turn "plausibly allege[d] that the police officers' actions constituted municipal policy." *Id.* at 979 (quoting *Dorger v. City of Napa*, No.12-cv-440 YGR, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012)). The court also held it was "likely" that Chief Garcia had

"policymaking authority" over police matters and that his failure to reprimand his officers also constituted ratification of their illegal acts. *Id.* (citation omitted). The court therefore "[denied] the City Defendants' [M]otion to Dismiss the § 1983 claim against the City to the extent that the claim [was] based on [Chief] Garcia's alleged ratification of the police officers' actions after the Trump Rally." *Id.* at 980.

This appeal followed.

## STANDARD OF REVIEW

"[The Court] review[s] de novo a district court's denial of a motion to dismiss on the basis of qualified immunity." *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012) (citing *Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010)). "[The Court] accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party." *Id.* (citation omitted). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## DISCUSSION

At the outset, we must determine the issues over which we have proper jurisdiction. "In general, [the Court] ha[s] jurisdiction to hear appeals only from 'final decisions.'" *Pauluk v. Savage*, 836 F.3d 1117, 1120 (9th Cir. 2016) (citing 28 U.S.C. § 1291 and *Johnson v. Jones*, 515 U.S. 304, 309 (1995)). In *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the

Supreme Court created a "narrow" exception to this general rule when a district court denies a motion to dismiss based on qualified immunity. *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997) (per curiam). "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [§ 1291] notwithstanding the absence of a final judgment." *Mitchell*, 472 U.S. at 530. The Court "may [also] exercise 'pendent' appellate jurisdiction over an otherwise nonappealable ruling if the ruling is 'inextricably intertwined' with a claim properly before [the Court] on interlocutory appeal." *Kwai Fun Wong v. United States*, 373 F.3d 952, 960 (9th Cir. 2004) (citations omitted).

Here, the City Defendants contend the district court erred when it (1) denied the Officers qualified immunity and (2) found the City liable under § 1983 for the Officers' actions. These are the only issues before the Court, and the district court's order has not been challenged otherwise. We clearly have jurisdiction over the first issue because it "rais[es] the 'purely legal' question of whether the facts alleged by the plaintiff demonstrate a violation of clearly established law." *Pauluk*, 836 F.3d at 1120 (citing *Johnson*, 515 U.S. at 313, 319–20)); *see also Penilla*, 115 F.3d at 709 (citation omitted). As will be explained more fully in this opinion, however, we lack jurisdiction to review the second issue because it is not "inextricably intertwined" with the first. *Kwai Fun Wong*, 373 F.3d at 960 (citations and internal quotation marks omitted). We address each issue in turn below.

## I.  Qualified Immunity

"Qualified immunity protects government officers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  "To determine whether an officer is entitled to qualified immunity, [the Court] ask[s], in the order [it] choose[s], (1) whether the alleged misconduct violated a [constitutional] right and (2) whether the right was clearly established at the time of the alleged misconduct." *Maxwell*, 708 F.3d at 1082 (citing *Pearson*, 555 U.S. at 232).  When this test is properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation and internal quotation marks omitted).

According to the Rally Attendees, the Officers violated their due process rights by exposing them to the danger of an unruly mob.  Because the Officers placed them in danger, which resulted in their injuries, and their rights were clearly established at the time of the Rally, the Attendees contend we should deny the Officers qualified immunity.  We agree.

### A.  Violation of a Constitutional Right

"As a general rule, members of the public have no constitutional right to sue [public] employees who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs (Grubbs I)*, 974 F.2d 119, 121 (9th Cir. 1992) (citing *DeShaney v. Winnebago Cty., Dep't of Soc. Servs.*, 489 U.S.

189, 197 (1989)). An exception to the rule applies when government employees "affirmatively place[] the plaintiff in a position of danger, that is, where [their] action[s] create[] or expose[] an individual to a danger which he or she would not have otherwise faced." *Kennedy*, 439 F.3d at 1061 (citing *DeShaney*, 489 U.S. at 197) (internal quotation marks omitted). The affirmative act must create an actual, particularized danger, *id.* at 1063, and the ultimate injury to the plaintiffs must be foreseeable, *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003). The employees must have also acted with "deliberate indifference" to a "known or obvious danger." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citation and internal quotation marks omitted).

### 1.  Affirmative Acts

"In examining whether an officer affirmatively places an individual in danger, [the Court] do[es] not look solely to the agency of the individual . . . [or] what options may or may not have been available to [her]." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). "Instead, [the Court] examine[s] whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Id.*; *see also Kennedy*, 439 F.3d at 1064 n.5 (recognizing relevant inquiry is whether state action "le[ft] [the plaintiff] in a situation *more dangerous* than the one she already faced" (emphasis added)).

The Attendees have sufficiently alleged that the Officers' affirmative acts increased the danger they faced at the Rally. According to the FAC, the Officers (1) "actively prevented the [A]ttendees from leaving [safely] through alternative exits," (2) "directed [the Rally Attendees] to leave from [a

single] exit," and (3) "required [the Attendees] to turn north . . . into the crowd of violent anti-Trump protesters." The danger that the anti-Trump protesters would hurt them was both "actual" and "particularized," *Kennedy*, 439 F.3d at 1063, as well as "foreseeable," *Lawrence*, 340 F.3d at 957—according to the FAC, the Officers "witnessed" the violence against the Attendees during the Rally, and there were reports from as early as 6 p.m. that evening that anti-Trump protesters had attacked people at the Rally. Taking these facts as true, as we must on a motion to dismiss, the Attendees have sufficiently alleged that the Officers placed them "in a more dangerous position" than the one in which they found themselves. *Penilla*, 115 F.3d at 710.

This Court has found similar affirmative acts sufficient to state a claim under the state-created danger doctrine. In *Munger*, for example, the officers "affirmatively ejected [the decedent] from a bar late at night [into] sub[-]freezing [temperature]" and "prevented [him] from driving his truck or reentering [the bar]." 227 F.3d at 1087. That the cold would eventually kill him was certainly foreseeable as he was "wearing only a t-shirt and jeans [and] was intoxicated." *Id.* The Court ultimately held it was "indisputable . . . that the officers placed Munger in a more dangerous position than the one in which they found him." *Id.* (citation internal quotation marks omitted).

In *Wood v. Ostrander*, the Court denied qualified immunity to an officer because the plaintiff had presented "genuine issues of material fact" on whether he had violated her due process rights. 879 F.2d 583, 590 (9th Cir. 1989) (citations omitted). Most of the factual disputes concerned the exact danger she faced and whether the defendant officer had knowledge of that danger. *See id.* But the affirmative

acts of the defendant were undisputed: he had (1) "arrested [the driver]," (2) "impounded [the driver's] car," and (3) "stranded [the plaintiff] in a high-crime area at 2:30 a.m." *Id.* These actions, according to the Court, "trigger[ed] a duty of the police to afford [the plaintiff] some measure of peace and safety." *Id.* (citations omitted). The Court further observed the danger to the plaintiff was foreseeable—"the inherent danger facing a woman left alone at night in an unsafe area [was] a matter of common sense." *Id.*

In *Kennedy*, the Court found the defendant-officer had "affirmatively created a danger" when he "drove to the Burns residence and notified the Burns family of the [plaintiff's] allegations [of molestation] against [the Burns's son,] Michael." 439 F.3d at 1063. The officer was aware Michael was dangerous, and he had promised to warn the plaintiff before taking any action against Michael, but ultimately failed to do so. *See id.* Michael later shot and killed the plaintiff's husband and severely wounded the plaintiff. *Id.* at 1057, 1063. Under these circumstances, the Court found the defendant officer "affirmatively created an actual, particularized danger [the plaintiff] would not otherwise have faced" and that the danger was "foreseeable." *Id.* at 1063, 1064 n.5.

Finally, in *Penilla*, the Court found the defendant officers violated the plaintiff's due process rights under the state-created danger doctrine. 115 F.3d at 711. The plaintiff there "became seriously ill," and his "neighbors and a passerby called 911 for emergency medical services." *Id.* at 708. The defendant officers "arrived first," but rather than helping the plaintiff, they "cancelled the request for paramedics, broke the lock and door jamb on the front door of [his] residence, moved him inside the house, locked the door, and left"—all

while knowing he was "in grave need of medical care." *Id.* Based on these allegations, the Court concluded "[t]he officers . . . took affirmative actions that significantly increased the risk facing [the plaintiff]." *Id.* at 710.

Just as in *Wood*, *Penilla*, *Munger*, and *Kennedy*, on the facts alleged, the Officers' affirmative acts created a danger the Rally Attendees otherwise would not have faced. Being attacked by anti-Trump protesters was only a possibility when the Attendees arrived at the Rally. The Officers greatly increased that risk of violence when they shepherded and directed the Attendees towards the unruly mob waiting outside the Convention Center.

But the Officers contend "[t]he relevant inquiry under the state-created danger doctrine is *not* whether police decision 'X' exposed a plaintiff to more danger than hypothetical police decision 'Y.'" It is "whether the involvement of police *at all* exposed the plaintiff to a danger that he would not have faced in the complete absence of that involvement." The Officers seize on the following language in *DeShaney*, where the Supreme Court held that county officials were not liable for the injuries a child sustained at the hands of his abusive father: "That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all." 489 U.S. at 201. Regardless of what they did or did not do, the Officers argue the "danger [to the Attendees] was already present by virtue of the heated speech activity taking place throughout the entire area of the [R]ally venue." Accordingly, the Officers could not have been the cause of the Attendees' injuries.

The argument proves too much.  If the Officers could avoid liability because the Rally was already dangerous and the Attendees were bound to be hurt, so too could the officer in *Wood* on grounds that the plaintiff was traveling through a high-crime area, the officers in *Penilla* because the plaintiff was already severely ill, and the officer in *Kennedy* on grounds that the plaintiff's neighbor was known to be unstable and violent.  Under the Officers' theory, liability would only attach when an official does "more than simply expose the plaintiff to a danger that already existed."  *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (citation and internal quotation marks omitted).  But that "is not the law of this circuit" and "would render the state-created danger doctrine meaningless."  *Id.*  Indeed, interpreting *DeShaney*, this Court has held the "critical distinction" for finding liability is not "between danger creation and enhancement, but . . . between state action and inaction in placing an individual at risk."  *Penilla*, 115 F.3d at 710.  It is with this focus that we ask whether "the affirmative actions of [the] official create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced."  *Willden*, 678 F.3d at 1002–03 (emphasis in original removed) (citation and internal quotation marks omitted).  While acknowledging the potential for danger at the Rally, the Attendees allege here they would have made it "to safety" had the Officers not affirmatively directed them into the crowd of protesters.  Accordingly, they have alleged sufficiently this prong of their state-created danger claim. *See Willden*, 678 F.3d at 1002–03 (citation and internal quotation marks omitted); *Munger*, 227 F.3d at 1086 (relevant inquiry is "whether the officers left the person in a situation that was more dangerous than the one in which they found him"); *Kennedy*, 439 F.3d at 1064 n.5 (relevant inquiry is

whether state action "le[ft] [the plaintiff] in a situation more dangerous than the one she already faced").

### 2. Deliberate Indifference

"Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). It "requires a culpable mental state," and the "standard [the Court] appl[ies] is even higher than gross negligence." *Id.* (citing *L.W. v. Grubbs (Grubbs II)*, 92 F.3d 894, 898–90 (9th Cir. 1996)). To claim deliberate indifference, the Attendees must allege facts demonstrating the Officers "recognize[d] [an] unreasonable risk and actually intend[ed] to expose [the Attendees] to such risks without regard to the consequences to [the Attendees]." *Id.* (quoting *Grubbs II*, 92 F.3d at 899). "In other words, the [Officers] [must] [have] 'known that something [*was*] going to happen but ignor[ed] the risk and expose[d] [the Attendees] to it [anyway].'" *Id.* (quoting *Grubbs II*, 92 F.3d at 900).

In *Wood*, for example, the Court held a jury could find the defendant Officer exhibited deliberate indifference if, among other things, he had "knowledge of the danger" to the plaintiff—if he knew that "the area where [the plaintiff] was stranded had the highest violent crime rate in the county outside the City of Tacoma." 879 F.2d at 590. He would have also shown deliberate indifference if he failed to make "any inquiry at all as to [the plaintiff's] ability to get safely home" or "ignored her request for help." *Id.*

In *Kennedy*, the defendant officer "knew that Michael was violent." 439 F.3d at 1064. The plaintiff "told [the officer]

in detail of Michael['s] violent tendencies, including [that he had] li[t] a cat on fire and assault[ed] his girlfriend with a baseball bat after breaking into her house." *Id.* Indeed, the plaintiff "testified that . . . she left several messages with the police department . . . in which she expressed continued fear for her family's safety and refreshed her concern that she be given notice before the Burns family was notified in the course of the [criminal] investigation." *Id.* Under these circumstances, the Court found the officer "acted deliberately and indifferently to the danger he was creating" when he notified Michael of the allegations against him without first warning the plaintiff. *Id.* at 1065.

In *Munger*, the officers ejected the decedent into sub-freezing temperatures even though "they knew [he] was wearing only a t-shirt and jeans [and] was intoxicated." 227 F.3d at 1087. "[T]he fact that the officers went looking for [the decedent] (or so claim), [further] demonstrate[d] . . . they were aware of the danger he was in." *Id.* Such indifference, coupled with the officers' affirmative acts, increased the danger to the decedent, and the Court therefore denied the officers qualified immunity. *See id.*

The Court reached the opposite conclusion in *Patel*. 648 F.3d at 976. There, a mother brought suit against her daughter's teacher for failing to supervise her daughter when she went to the bathroom. *See id.* at 969. The lack of supervision, according to the mother, led to "several sexual encounters with another developmentally disabled student." *Id.* at 968. The Court found no deliberate indifference, in part, because while the teacher "knew . . . [the plaintiff's daughter] required extensive supervision and had been involved in past bathroom incidents," the "details of [those incidents] were unknown to [her]," and she was not otherwise

aware of "any *immediate* danger in allowing [the student] to briefly use the next-door bathroom alone." *Id.* at 975–76. Accordingly, the Court found "no rational factfinder could conclude that [the teacher] acted with deliberate indifference to [the student's] safety and well-being." *Id.* at 976.

Like the officers in *Wood*, *Munger*, and *Kennedy*, the Officers here were aware of the danger to the plaintiffs—they knew the anti-Trump protesters posed an immediate threat to the Attendees. According to the FAC, "as early as [6 p.m.] the day of the Rally, the San Jose police warned *all officers deployed around [the] Rally* that assaults had already been reported outside the [Convention Center]." And throughout the Rally, the Officers "witnessed the many violent criminal acts perpetrated by dozens of anti-Trump protesters" and yet continued to "direct[] [the Attendees] into the mob." The allegations here, if true, demonstrate the Officers "act[ed] with deliberate indifference to a known [and] obvious danger." *Patel*, 648 F.3d at 971–72 (citation and internal quotation marks omitted).

Indeed, the Officers' actions are in some ways even more culpable than those of the officer in *Kennedy*. The Court there found the officer was deliberately indifferent because he was aware of Michael's *past* acts of violence—that he "had . . . beaten [his girlfriend] with a baseball bat" and had once "li[t] a cat on fire." *Kennedy*, 439 F.3d at 1064. Here, the Officers were not only aware that Trump rallies had drawn violent crowds in the past but had also received reports of violence on the day of the Rally and witnessed the violence firsthand during the Rally. Their actions therefore are distinguishable from those of the teacher in *Patel* who, unlike the Officers here, "did not know there was any *immediate*

danger in allowing [the student] to . . . use the . . . bathroom alone." 648 F.3d at 976.

Taking the allegations in the FAC as true, the Attendees have adequately claimed a due process violation pursuant to the state-created danger doctrine. They have asserted sufficiently that the Officers (1) "affirmatively place[d] [them] in danger," and (2) "act[ed] with deliberate indifference to [a] known or obvious danger in subjecting [them] to [that danger]." *Kennedy*, 439 F.3d at 1062 (citations and internal quotation marks omitted).

**B. Clearly Established Law**

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090–91 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)). The Attendees "must point to prior case law that articulates a constitutional rule specific enough to alert *these* [Officers] *in this case* that *their particular conduct* was unlawful." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

The Attendees first point to *Wood* and *Kennedy* to argue their rights were clearly established at the time of the Rally. We disagree. At best, these cases merely define the contours of the state-created danger doctrine and stand for the "broad

general proposition" that an officer may not, through her affirmative acts, place a person in danger and act with deliberate indifference to that danger. *Keates v. Koile*, 883 F.3d 1228, 1239 (9th Cir. 2018) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)) (internal quotation marks omitted). While the principles from those cases certainly apply, neither case is remotely "[]similar on its facts" to the case at hand. *Sharp*, 871 F.3d at 911; *see also Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018) (finding law was not clearly established because "the language in the Letter is not *similar* to phrasing that [the Court has] found to be stigmatizing" (emphasis added)). Neither *Wood* nor *Kennedy* involved officers who implemented a crowd-control plan at a rally—*Wood* involved an officer who abandoned the plaintiff in a high-crime area, and *Kennedy* concerned an officer who stoked the violent tendencies of a dangerous neighbor. *See Wood*, 879 F.2d at 589–90; *Kennedy*, 439 F.3d at 1063. "Whatever the merits of the decision[s] in [*Wood* and *Kennedy*], the differences [in the facts of those] case[s] and [this] case . . . leap from the page." *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (per curiam) (citation and internal quotation marks omitted). Without more, *Wood* and *Kennedy* did not place these Officers on notice that their actions were unlawful "in light of the specific context of [this] case." *Keates*, 883 F.3d at 1239 (quoting *Mullenix*, 136 S. Ct. at 308).

But the Attendees have also cited *Johnson*, a case that clearly establishes the state-created danger doctrine applies to the crowd-control context. *See* 474 F.3d at 640–41. There, the plaintiffs alleged the defendant-officers were "liable for enhancing their danger [at a Mardi Gras celebration] . . . by abandoning the operational plan for crowd control . . . call[ing] for . . . aggressive law enforcement, and, instead,

implementing a more passive plan of staying on the perimeter of the crowd." *Id.* at 638. Although we ultimately held the plaintiffs failed to establish a constitutional violation, we did so because of the "absence in [the] case of any affirmative conduct by the [officers] that increased the risk of harm to [those at the Mardi Gras celebration]." *Id.* at 640. Had the officers in *Johnson* engaged in affirmative conduct akin to directing someone involuntarily into dangerous conditions (as the Officers did here), they would have been liable under the state-created danger doctrine. *Id.* (citing *Munger*, 227 F.3d at 1084). The officers would have also been liable if they had "confine[d] the . . . [p]laintiffs to a place where [the plaintiffs] would be exposed to a risk of harm by private persons"—e.g., at the center of an unruly mob of protesters. *Id.* "The reasoning, though not the holding, [of *Johnson*] . . . . gave fair warning to [the Officers] that their conduct crossed the line of what is constitutionally permissible." *Hope*, 536 U.S. at 743 (citation omitted); *see also id.* at 739 (finding relevant inquiry was whether "in the light of pre-existing law, the unlawfulness [of the conduct is] apparent," not whether "the very action in question has previously been held unlawful" (citations and internal quotation marks omitted)). "[T]he violative nature of [the Officers'] *particular* conduct [was therefore] clearly established" at the time of the Rally. *Hamby*, 821 F.3d at 1091 (quoting *Mullenix*, 136 S. Ct. at 308).

Based on the allegations in the FAC, which we take as true at this stage of the proceedings, we also find that this is "one of those rare cases" in which the constitutional violation "is so 'obvious' that we must conclude . . . qualified immunity is inapplicable, even without a case directly on point." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013) (quoting *Hope*, 536 U.S. at 740–41); *see also*

*Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("[I]n an obvious case, [highly generalized standards] can clearly establish [a constitutional violation], even without a body of relevant case law." (citation and internal quotation marks omitted)).[2]  Here, the Attendees allege the Officers shepherded them into a violent crowd of protesters and actively prevented them from reaching safety.  The Officers continued to implement this plan even while witnessing the violence firsthand, and even though they knew the mob had attacked Trump supporters at the Convention Center earlier that evening, and that similar, violent encounters had occurred in other cities.  Viewed in the light most favorable to the Attendees, these allegations establish "with obvious clarity" that the Officers increased the danger to the Attendees and acted with deliberate indifference to that danger, pursuant to the state-created danger doctrine. *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation and internal quotation marks omitted).

We therefore hold "that the operative complaint alleges facts that allow us 'to draw the reasonable inference that the [Officers are] liable for the misconduct alleged,'" *Keates*, 883 F.3d at 1240 (quoting *Iqbal*, 556 U.S. at 678), and that the district court properly denied the Officers qualified immunity at this stage of the proceedings.  This, of course, "does not mean that th[e] case must go to trial," *id.* at 1240

---

[2] "[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.  Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Sharp*, 871 F.3d at 911 n.7 (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.)).

(citation and internal quotation marks omitted), or that the Officers are now precluded from ever asserting a claim for qualified immunity in this litigation.  As we have noted time and again, "[o]nce an evidentiary record has been developed through discovery, [the Officers] will be free to move for summary judgment based on qualified immunity."  *Id.* (citation and internal quotation marks omitted); *see also Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1233 (9th Cir. 2006) (noting qualified immunity is "normally . . . resolved on summary judgment" (quoting *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998) (citation omitted))).

## II. *Monell* Liability

The City claims the district court also erred when it concluded the Attendees had stated sufficiently a § 1983 claim against the City under *Monell*.  According to the FAC, Chief Garcia "expressly ratified" the allegedly unconstitutional acts of his officers when he "publicly . . . . lauded [their] 'discipline and restraint,' and [further] supported the officers' passive refusal to break-up nearby scuffles."  "Garcia [also] took no disciplinary actions against the officers in response to [their allegedly] [un]constitutional [conduct]."  The district court held that "Garcia's statements after the Trump Rally praising the actions of [the] police officers" and his "failure to reprimand [them]" were "sufficient to state a claim that the [City] ratified [their] actions" in violation of § 1983.  *Hernandez*, 241 F. Supp. 3d at 980.  Because we lack jurisdiction to review the merits of the Attendees' claims against the City, we dismiss the City's appeal.

"A municipality is not entitled to assert the defense of qualified immunity."  *Huskey v. City of San Jose*, 204 F.3d

893, 902 (9th Cir. 2000) (citing *Owen v. City of Indep.*, 445 U.S. 622, 638 (1980)). "Thus the rule announced [by the Supreme Court] that individual defendants can appeal from the denial of a motion [to dismiss] to obtain review of the merits of their qualified immunity defense does not [ordinarily] empower a federal court to consider the denial of a municipality's [similar] motion . . . in a § 1983 action." *Id.* (citing *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 38 (1995)); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 870 (9th Cir. 1992) (citing *Mitchell*, 472 U.S. at 527) (permitting interlocutory appeal of qualified immunity issue at motion-to-dismiss stage).

A court may nonetheless exercise "pendent jurisdiction" over the claims against the municipality if they are "'inextricably intertwined'" with the qualified immunity issue. *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1109 (9th Cir. 2016) (quoting *Swint*, 514 U.S. at 51)); *see also Huskey*, 204 F.3d at 906. The Court "interpret[s] the 'inextricably intertwined' standard narrowly" and applies it in "extremely limited" circumstances. *Puente Ariz.*, 821 F.3d at 1109 (citations omitted). "The standard is only satisfied where the issues are (a) . . . so intertwined that [the Court] must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Id.* (citation and internal quotation marks omitted).

Neither prong is satisfied here. First, we need not decide "the pendent issue"—whether the Attendees have stated a § 1983 claim against the City premised on their ratification theory—in order to decide the issue "properly raised on interlocutory appeal"—whether the Officers are entitled to

qualified immunity. *Id.* (citation and internal quotation marks omitted). Whether the allegations concerning Chief Garcia's public statements and his failure to discipline his officers are sufficient to constitute ratification is an issue that is not necessary for deciding whether the Officers violated the Attendees' due process rights on the night of the Rally by directing them towards violent protesters.

Recognizing this, the City proceeds only under the second prong of the test, arguing "resolution of the issue properly raised [on] appeal necessarily resolves the pendent issue." According to the City, "a negative answer to the question whether the employee violated the Constitution will always necessarily resolve the pendent issue of whether the municipality was liable for the violation." While this might be true in some cases, *see, e.g.*, *Huskey*, 204 F.3d at 906, the principle is inapplicable here because we have held the Officers *violated* the Attendees' due process rights, based on the allegations in the FAC. That may mean that the City—through Chief Garcia's ratification of his officers' conduct—is also liable under § 1983, but it does not "*necessarily* resolve[]" the issue one way or another. *Id.* at 905–06 (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995) (stating qualified immunity and ratification were "different issues")).[3] The City's liability will turn on whether Chief Garcia "took . . . steps to reprimand or discharge the [Officers], or . . . failed to admit [their] conduct was in error." *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986). The Officers' liability, as discussed

---

[3] For the City to be liable under this theory, it is certainly *necessary* for the Officers to have violated constitutional rights. But just because the Officers engaged in unconstitutional conduct does not *necessarily resolve* whether Chief Garcia ratified such conduct.

at length above, will turn on whether they increased the danger to the Attendees and acted with deliberate indifference to that danger. Because we must apply "different legal standards" to whether Chief Garcia actually ratified the Officers' conduct and to whether that conduct was unconstitutional, the two issues are not "inextricably intertwined," and the City's appeal is not subject to pendent jurisdiction. *Puente Ariz.*, 821 F.3d at 1109 (citation and internal quotation marks omitted). We therefore "dismiss [the City's] appeal for lack of jurisdiction." *Id.* at 1110.

## CONCLUSION

Based on the allegations in the operative complaint, which we take as true on a motion to dismiss, the Attendees have alleged sufficiently that the Officers increased the danger to them by shepherding them into a crowd of violent protesters and that the Officers acted with deliberate indifference to that danger. The district court therefore correctly denied the Officers qualified immunity. As for the Attendees' claim against the City, we decline to exercise jurisdiction over it because it is not inextricably intertwined with the qualified immunity issue.

**AFFIRMED in part, and DISMISSED in part.** Costs are to be taxed against Defendants-Appellants.